*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | Supreme Court No. S-17544 |
| APRIL S., a Minor. | ) | |
| | ) | Superior Court No. 3AN-18-00394 CN |
| | ) | |
| | ) | O P I N I O N |
| | ) | |
| | ) | No. 7469 – July 24, 2020 |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Yvonne Lamoureux, Judge.

Appearances: J. Adam Bartlett, Anchorage, for April S. Laura Fox, Senior Assistant Attorney General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for State of Alaska.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

STOWERS, Justice.
WINFREE, Justice, with whom CARNEY, Justice, joins, concurring.

## I.   INTRODUCTION

An Alaska Native teenage minor affiliated with the Native Village of Kotzebue (Tribe) was taken into custody by the Office of Children's Services (OCS) and placed at a residential treatment facility in Utah. She requested a placement review hearing after being injured by a facility staff member. At the time of the hearing, the minor's mother wanted to regain custody. At the hearing the superior court had to make

removal findings under the Indian Child Welfare Act (ICWA)[1] as well as findings authorizing continued placement in a residential treatment facility under Alaska law.[2] ICWA requires testimony from a qualified expert witness for the removal of an Indian child. At the hearing, the minor's Utah therapist testified as a mental health professional. The minor, as well as her parents and the Tribe, objected to the witness being qualified as an ICWA expert, but the superior court allowed it. The minor argues that the superior court erred in determining that the witness was qualified as an expert for the purposes of ICWA. Because the superior court correctly determined that knowledge of the Indian child's tribe was unnecessary in this situation when it relied on the expert's testimony for its ICWA findings, we affirm.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

April S. is Alaska Native and was 17 years old at the time of this appeal.[3] She arrived at Covenant House, an emergency youth shelter, on August 8, 2018. Covenant House sent April to OCS the following day; she was not allowed to stay at Covenant House for more than one night "because of her recent out of control behavior at [the] facility." When April arrived at OCS, a caseworker contacted April's mother, Jessica S., who reportedly stated "she 'can't handle [April] anymore' and she wants [OCS] to 'take her' " because of April's "outbursts, general attitude and hostility, and unwillingness to follow rules in the home or get medication and counseling." She explained that April was "engaging in substance use and acting out with household members in violent ways." April allegedly had engaged in such behaviors as "running

---

[1]    *See* 25 U.S.C. § 1912(e) (2018).

[2]    *See* AS 47.10.087(b).

[3]    We use pseudonyms to protect the family's privacy.

away"; "using methamphetamine, alcohol, [and] marijuana"; "being sexually trafficked"; and "assaulting others." April was reported to have had a number of serious mental health disorders, including past diagnoses for bipolar disorder and post-traumatic stress disorder. At the time she was taken into OCS custody, April was reportedly "experiencing mental and physical health problems, including psychotic paranoia episodes . . . [and] urinating on herself daily."

OCS believed that April was a child in need of aid because she "[did] not have a parent ensuring her medical and mental health needs are met, nor [was] anyone willing or able to provide her shelter or meet her other basic needs."[4] OCS placed April in an Alaska Native foster home and obtained temporary custody. April ran away from the foster home, and when she returned the next day OCS brought her for a drug test. April tested positive for methamphetamine and was held at the Alaska Native Medical Center.

April was admitted to Alaska Psychiatric Institute (API) in late August. She stayed at API through late October, at which point she was transferred to a secure residential treatment facility in Utah called Provo Canyon. The court then held hearings for continued placement in a secure residential treatment facility every 90 days pursuant to AS 47.10.087 (.087 hearing).[5]

In the spring of 2019 April's arm was injured at Provo Canyon. April's arm had previously been broken in a restraint by a staff member at McLaughlin Youth Center. As a result of that injury, she had plates and screws placed in her arm. After a

---

[4] OCS also contacted April's father, who similarly indicated he did not want to care for April.

[5] AS 47.10.087(a) allows the court to authorize OCS "to place a child who is in the custody of [OCS] . . . in a secure residential psychiatric treatment center." AS 47.10.087(b) provides that "[the] court shall review a placement made under this section at least once every 90 days."

restraint by a Provo Canyon staff member on April 30, April complained of left arm pain. She had a CT scan, which indicated that some of the hardware in her arm from the previous injury was "loosening or fail[ing]."

After this incident April filed a motion for a placement review hearing. She explained the injury, stating "that a male staff member at Provo Canyon bent her arm while putting her in manual restraints and something in her shoulder tore." She said that the "staff member still has access to her at the program" and reported that "she does not feel safe." She requested that the court review her placement at the next .087 hearing, scheduled for May 20.

**B.      Proceedings**

The superior court initially held a combined .087 hearing and placement review hearing on May 20. The court started to hear testimony from Jennifer Oxford, a counselor at Provo Canyon who was qualified as a mental health professional by the court. But the hearing was continued until a later date because April had not received certain documents in discovery. The judge assigned to April's case indicated that she would be out of town the following week but would find another judge to do the hearing.

The hearing was continued on May 30 with a new judge. At this point, Jessica wanted April returned to her. Jessica had told her attorney the previous day that "she just wants her daughter home." Jessica stated that April was "ready to come and move forward with her life and not stay in the system any longer" and that the placement was "not really helping her at all." She further explained that fishing season was starting, making it "the perfect time right now to . . . rehabilitate [April] back into the community, her home." Because Jessica wanted April back, there was a need for removal findings under ICWA. The parties and court agreed to continue the hearing so that both issues could be heard before the original judge.

In advance of the continued hearing April filed a brief addressing the two issues before the court. First, she contended that the superior court had to determine whether April's removal from her parent was proper under ICWA. This would require the court to find "by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child."[6] Second, April contended that if the answer to the first question was "yes," the court would then have to determine whether placement "in a secure residential psychiatric treatment center" was proper under AS 47.10.087. April argued that "under AS 47.10.087(b), the court may only authorize placement of the child in a secure residential treatment center if 'the child's mental condition could be improved by the course of treatment or would deteriorate if untreated.' " April also argued that Oxford was not a qualified expert witness for purposes of ICWA because she did not have any "cultural competency regarding the Native Village of Kotzebue" and did not have "adequate knowledge of parental conduct."

The hearing resumed in mid-June. OCS's first witness was April's OCS caseworker. He explained that at the time of April's removal, OCS was concerned about "abandonment and failure to provide medical and mental health care for the child." He indicated that OCS had not made much progress in case planning with Jessica because she would not accept any responsibility for her conduct and therefore would not address any of OCS's concerns with her behavior and its effect upon April. He wanted to see Jessica engage with OCS and potentially complete a mental health assessment and parenting classes. He also identified and discussed some of the alternative placement options that OCS had considered for April.

---

[6]     25 U.S.C. § 1912(e).

The court then heard testimony from Oxford. OCS moved to qualify her as "an expert in mental health counseling." April objected to Oxford's "testimony as meeting the qualified expert witness requirement of [ICWA]." April asked Oxford about her knowledge of Alaska Native culture. Oxford indicated that she had never worked in Alaska, did not know the name of April's tribe, and did not have "professional knowledge" of Inupiat culture. She testified that she did not have any knowledge of "the social and cultural values of the Native Village of Kotzebue" and had never been to Kotzebue. Jessica's parents and the Tribe also objected to Oxford's testimony being used for the purposes of ICWA. The court determined that Oxford was an expert in mental health counseling but did not make a ruling on the ICWA issue.

OCS also questioned Oxford about her knowledge of different cultures. Oxford stated that her degree and licensure in mental health was not "specific to any one culture" and that cultural background does not matter when considering whether someone presents an "imminent danger" to self or others. She stated that "there's nothing in diagnosing somebody that questions their culture, that's not any criteria in diagnosing anyone with a mental illness."

Oxford then explained April's diagnoses based on the DSM-5.[7] April was diagnosed with schizoaffective disorder; post-traumatic stress disorder; and cannabis, alcohol, and tobacco use disorder. Oxford also indicated that part of April's diagnoses included child sexual abuse, child physical abuse, child neglect, psychological abuse, and parent-child relational problems. She acknowledged "that evaluating a symptom could in some cases when it's more subjective take in a cultural basis," but maintained that the fact that April is an Alaska Native does not put her more or less at risk because "trying to kill yourself is risky no matter what culture you come from."

---

[7] *See generally* AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (5th ed. 2013).

Oxford then testified regarding April's progress at Provo Canyon, stating that April had refused medication and that April's condition had deteriorated when she went off medication a few months earlier. She explained that April had more recently shown some progress, including reduced symptoms and fewer restraints; this seemed to be related to a new medication that April had started taking. Oxford recommended a lateral transfer to a different secure residential treatment facility instead of to a less secure facility because "there [had not] been enough consistent safety or engagement that proves that [April] could be successful and/or safe in a lower level of care." She believed that if April were discharged to a non-therapeutic setting, it would cause serious emotional or physical damage. Oxford identified "specific areas of concern," stating:

> [April] has made it very clear that she intends to return to using substances[,] both drugs and alcohol. She continues to self-harm which shows that she's a danger to herself including suicidal gestures at times. And then if she does not take her medication, her current prognosis . . . is that she will continue to possibly be violent but could be a danger to herself and others. And she does not want to take her med[ication]s is what she's told me. . . . [T]hat's my understanding of why I say that . . . it's a dangerous situation.

Oxford elaborated on her specific concerns during cross-examination. Oxford indicated that April had engaged in self-harming behavior in the past 48 hours and expressed concern that if April was alone, she could be successful in her suicide attempts. Further, Oxford explained that April had told her that she has "command hallucinations to attack people" when she is not medicated and that during those episodes of psychosis, "[April] doesn't want to attack people[,] but she doesn't feel like she can stop herself."

The court also heard testimony from April, who indicated that she "would prefer to live with [her] mom but any other facility works, too." April testified that she

felt the staff members "purposely hurt" her. She also indicated that she was willing to take her medication.

The court then moved to closing arguments. OCS first argued that April met the statutory requirements for continued residential treatment under AS 47.10.087. It indicated that it would try to transfer April to a different facility. OCS then addressed removal under ICWA, arguing it had shown that April would suffer serious harm outside a therapeutic setting. It stated that Oxford was a qualified expert witness under ICWA. It argued that an expert need not "have specific knowledge of the child's culture, [or] the child's tribe . . . [if] the issue that causes the child to be at risk of harm . . . doesn't implicate cultural issues." It argued that this case did not involve the Tribe's culture because "a mental illness in which the child's behavior places her at substantial risk of harm . . . [is] going to be true regardless of what her culture is." OCS asked the court to find that Oxford qualified as an expert in a relevant field — mental health — for the purposes of ICWA.

April argued that the court had to address the removal question under ICWA first. She asserted that Oxford was not a qualified expert witness under ICWA because Oxford "ha[d] no familiarity with any of the cultural norms for [April] and the Native Village of Kotzebue." She "disagree[d] with [OCS] that mental health does not implicate cultural bias," noting that Oxford admitted that "symptoms of mental illness can be affected by culture." She also discussed the OCS caseworker's testimony that Alaska Native children are "disproportiona[tely] . . . removed to out-of-state facilities," creating a concern with "cultural loss." She argued that OCS had not met its burden under ICWA for removal. She also asserted that OCS had not proven "that [April]'s mental condition could be improved by the course of treatment or deteriorate if

untreated."[8] The parents "completely agree[d]," additionally noting that April "ha[d] no contact with her culture at this time," that "[n]obody [was] familiar with her cultural connections," and that "Oxford kn[ew] nothing about Kotzebue," as well as asserting that "there are cultural factors that are relevant to diagnosis and treatment of mental health" and that "symptoms can manifest differently or be characterized differently by a provider based on cultural factors."

In response, OCS acknowledged that cultural loss was occurring, but emphasized that "whether there is cultural loss is a very different question than whether risk to the child is tied to cultural issues or cultural norms." It reiterated that there was "no testimony . . . to suggest that cultural issues somehow impact the risk that [April] poses to herself or others or the risks that would be posed by placing her in a non-therapeutic setting like her mother's home."

The court delivered its ruling orally. After discussing the ICWA statute and regulations, the court quoted verbatim the relevant portion of the Bureau of Indian Affairs' (BIA) Guidelines, which state that "while a qualified expert witness should normally be required to have knowledge of Tribal social, and cultural standards, that may not be necessary if such knowledge is plainly irrelevant to the particular circumstances at issue in the proceeding."[9] The court discussed April's diagnoses and determined that "there are a number of very heightened needs that [April] has at this time that require a level of treatment and care that render the knowledge of her tribe's culture irrelevant to the question of removal at this time." It ultimately found "there is clear and convincing evidence based on Ms. Oxford's testimony that [April] is likely to suffer serious

---

[8]     *See* AS 47.10.087(b).

[9]     BUREAU OF INDIAN AFFAIRS, U.S. DEP'T OF THE INTERIOR, GUIDELINES FOR IMPLEMENTING THE INDIAN CHILD WELFARE ACT 54 (2016) (hereinafter 2016 GUIDELINES).

emotional and physical damage if she were returned to her mother's custody at this time."[10] It also found that April met the requirements for continued residential placement under AS 47.10.087.

The court issued a written order authorizing placement in a secure residential psychiatric treatment center and requiring OCS to "identify and transfer [April] to a different treatment center as soon as possible."

April appeals, arguing only that the superior court erred in determining that Oxford qualified as an expert witness under ICWA.

## III. STANDARD OF REVIEW

"We review de novo the court's conclusions of law, such as whether . . . the expert testimony presented at trial satisf[ies] the requirements of ICWA."[11]

## IV. DISCUSSION

### A. The Superior Court Did Not Err In Determining That Jennifer Oxford Was An Expert For Purposes Of ICWA.

ICWA establishes requirements for child custody proceedings involving Indian children. It states that "[n]o foster care placement may be ordered . . . in the absence of a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child."[12] A "foster care placement" under ICWA is defined as "any action removing an Indian child

---

[10]     *See* 25 U.S.C. § 1912(e). The court described the harm as "not specific to [Jessica]'s home" and relied on the fact that Jessica "ha[d] not participated in these hearings at all" in finding serious harm.

[11]     *Eva H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 436 P.3d 1050, 1052 (Alaska 2019) (quoting *Bob S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 400 P.3d 99, 105 (Alaska 2017)).

[12]     25 U.S.C. § 1912(e).

from its parent . . . for temporary placement in a[n] . . . institution . . . where the parent . . . cannot have the child returned upon demand, but where parental rights have not been terminated."[13]  In this case, April was not being removed from her mother; she was already in OCS custody.  But because April was an Indian child at the time of the removal hearing, the superior court had placed April in a secure residential institution, and Jessica could not have April returned upon demand, the parties agree that the requirements of the removal provision apply; we proceed under that assumption without deciding the issue.

The sole issue before us is whether there was testimony from a qualified expert witness for purposes of ICWA.  The parties discussed this question extensively in the superior court proceeding.  April and her parents argued that Oxford was not qualified under ICWA because she had no knowledge of Alaska Native culture.  OCS acknowledged that Oxford did not have any such knowledge, but argued that it was not necessary in this case.  The superior court agreed with OCS and concluded that Oxford was a qualified expert witness for purposes of ICWA.

On appeal, April argues that the superior court erred in making this determination, relying on the statute, its implementing regulations and guidelines, and Alaska case law.  She asserts that "cases where cultural knowledge is not required are the exception rather than the rule."  April identifies gaps in Oxford's knowledge of the Tribe, including the "kind of support structure Native culture provides for young women like [April]"; "how the Native Village of Kotzebue addresses mental illness"; "how, or if, the Native culture of Kotzebue provides resources for tribal members who struggle with mental health concerns"; and "how April would respond to traditional Native cultural remedies and activities."  She argues that Oxford could not have determined that

---

[13]     *Id.* § 1903(1)(i).

Native culture was irrelevant in this case because she did not know anything about Native culture.

OCS maintains that Oxford was a qualified expert witness as required by ICWA. It argues that "[n]o cultural knowledge was needed to establish that placing a child with [April]'s serious mental health treatment needs in the care of an untrained and unprepared mother — a mother who had previously kicked her out of the house and abandoned her — would likely harm her." OCS notes that we have "observ[ed] that cultural expertise is 'not essential in every case.'"[14] OCS argues the superior court could decide cultural expertise was not necessary here given April's "very serious mental health issues" and need for "psychiatric treatment," as well as the fact that "her parents abandoned [her]."

We look to the ICWA statute, regulations, guidelines, and case law in determining whether Oxford was a qualified expert witness for purposes of ICWA. Congress passed ICWA to address its concern "that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public . . . agencies and that an alarmingly high percentage of such children are placed in non-Indian . . . institutions."[15]

The BIA issued new ICWA regulations in June 2016;[16] these regulations are binding on this court.[17] We thus look to the federal regulation defining the requirements for a "qualified expert witness":

---

[14]     *See Eva H.*, 436 P.3d at 1054.

[15]     25 U.S.C. § 1901(4).

[16]     Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38,778 (June 14, 2016) (to be codified at 25 C.F.R. pt. 23).

[17]     *See Eva H.*, 436 P.3d at 1053 & n.9 (noting that federal ICWA regulations are binding).

A qualified expert witness must be qualified to testify regarding whether the child's continued custody by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child and should be qualified to testify as to the prevailing social and cultural standards of the Indian child's Tribe.[18]

The BIA has also published guidelines for interpreting the ICWA regulations.[19] While the guidelines are not binding, we have recognized that they are useful to consider.[20]

The BIA Guidelines explain that "Congress recognized that States have failed to recognize the essential Tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families" and thus passed ICWA "to make sure that Indian child-welfare determinations are not based on 'a white, middle-class standard which, in many cases, forecloses placement with [an] Indian family.' "[21] Therefore, "expert testimony presented to State courts should reflect and be informed by those cultural and social standards" so that "relevant cultural information is provided to the court and . . . expert testimony is contextualized within the Tribe's social and cultural standards."[22]

Notwithstanding, the BIA Guidelines note that the regulation "does not . . . strictly limit who may serve as a qualified expert witness to only those individuals who have particular Tribal social and cultural knowledge," recognizing that "knowledge of Tribal social and cultural standards . . . may not be necessary if such

---

[18]    25 C.F.R. § 23.122(a) (2019).

[19]    2016 GUIDELINES, *supra* note 9.

[20]    *Eva H.*, 436 P.3d at 1053.

[21]    2016 GUIDELINES, *supra* note 9, at 54 (alteration in original) (quoting *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 37 (1989)).

[22]    *Id.*

knowledge is plainly irrelevant to the particular circumstances at issue in the proceeding."[23]  As an example, the Guidelines state that

> a leading expert on issues regarding sexual abuse of children may not need to know about specific Tribal social and cultural standards in order to testify as a qualified expert witness regarding whether return of a child to a parent who has a history of sexually abusing the child is likely to result in serious emotional or physical damage to the child.[24]

But the BIA has made clear that there are only "*limited circumstances* where [knowledge of tribal customs and culture] is plainly irrelevant."[25]  In passing the ICWA regulations, the BIA disagreed with the suggestion that "State courts or agencies are well-positioned to assess when cultural biases or lack of knowledge is, or is not, implicated," and that "ICWA was enacted in recognition of the fact that the opposite is generally true."[26]  The BIA also indicated that a number of "theories . . . presented by experts in foster-care . . . proceedings are based on Western or Euro-American cultural norms and may have little application outside that context."[27]  The regulations and guidelines thus suggest that state courts should exercise extreme caution in determining that cultural knowledge is plainly irrelevant.

---

[23]     *Id.*

[24]     *Id.*

[25]     Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38,778, 38,830 (June 14, 2016) (to be codified at 25 C.F.R. pt. 23) (emphasis added).

[26]     *Id.*

[27]     *Id.*

We discussed the ICWA regulations and guidelines last year in *Eva H.*[28] We recognized that under the 2016 ICWA regulations, "the ability to testify about the risk of harm is required of every qualified expert witness, but the ability to testify about the 'prevailing social and cultural standards' is not essential in every case."[29] We also noted that "[t]his distinction is one we have recognized, and the guidelines show that it remains valid,"[30] referring to our line of cases recognizing that "termination proceedings under ICWA do not require testimony by an expert in Native culture if the grounds for termination do not implicate cultural biases."[31] Specifically, we have held that "[w]hen the basis for [removal] is unrelated to Native culture and society and when lack of familiarity with cultural mores will not influence the [removal] decision or implicate cultural bias in the [removal] proceeding, the qualifications of an expert testifying under [ICWA] . . . need not include familiarity with Native culture."[32]

---

[28] *Eva H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 436 P.3d 1050, 1053-55 (Alaska 2019).

[29] *Id.* at 1054 (quoting 25 C.F.R. § 23.122(a)); *see also Oliver N. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 444 P.3d 171, 177, 180 (Alaska 2019) (emphasizing the difference between "must" and "should" in the ICWA regulation).

[30] *Eva H.*, 436 P.3d at 1054.

[31] *Payton S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 349 P.3d 162, 172 (Alaska 2015); *see, e.g., In re Candace A.*, 332 P.3d 578, 584 (Alaska 2014); *Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 291 P.3d 957, 964 (Alaska 2013); *Marcia V. v. State, Office of Children's Servs.*, 201 P.3d 496, 503 (Alaska 2009); *L.G. v. State, Dep't of Health & Soc. Servs.*, 14 P.3d 946, 953 (Alaska 2000).

[32] *In re Candace A.*, 332 P.3d at 584 (alterations in original) (quoting *Thea G.*, 291 P.3d at 964).

The factual circumstances in this case fall within the class of concerns that ICWA was designed to address — a Native child being placed in a non-Indian, out-of-state institution and becoming completely disconnected from her Native culture.[33] Notwithstanding, as previously discussed the BIA has recognized and we have held that a qualified expert witness under ICWA need not always have knowledge of Native culture. We recognize that the exception is very limited. But this case is one that falls within that very limited exception. The superior court carefully, thoughtfully, and correctly determined that knowledge of the Tribe's culture was unnecessary in this case because of April's "very heightened mental health needs," as evidenced by her repeated suicide attempts, engagement in self-harming behaviors just prior to the removal hearing, and attacks on staff members at the facility. The Tribe's cultural practices are not directly relevant to the removal decision; April is being removed because she needs intensive mental health treatment that cannot be achieved outside of a residential treatment center, not because of any specific living conditions at her mother's home that might implicate cultural biases. Oxford did not need to have expertise in Native culture to determine that April had severe mental health disorders that would present a danger to herself and others outside of a secure residential treatment facility. And the superior court ameliorated April's cultural loss by approving her request for a lateral transfer and ordering OCS to provide in-person contact with her parents. The superior court therefore did not err in determining that Oxford was qualified for the purposes of ICWA despite her lack of knowledge of Alaska Native culture.

## V.   CONCLUSION

We AFFIRM the superior court's order.

---

[33]   *See* 25 U.S.C. § 1901(4)-(5).

WINFREE, Justice, with whom CARNEY, Justice, joins, concurring.

Given April S.'s extraordinary self-harming issues and her refusal to consistently take prescribed medication, I cannot disagree with the court's decision. But I also must acknowledge that our view is necessarily limited by the lack of evidence Office of Children's Services (OCS) could have provided concerning relevant Native culture, particularly how Native Village of Kotzebue addresses mental health challenges facing its tribal children in the Kotzebue area. There is growing recognition of "the importance of delivering culturally responsive, evidence-based services to address" behavioral and mental health challenges facing Alaska Natives.[1] Without access to evidence directly informed by Native Village of Kotzebue's cultural and social practices, I cannot foreclose the possibility that some of April's heightened needs may be caused, or at least exacerbated, by being in a facility entirely disconnected from her culture.[2]

---

[1] SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION (SAMHSA), BEHAVIORAL HEALTH SERVICES FOR AMERICAN INDIANS AND ALASKA NATIVES: TREATMENT IMPROVEMENT PROTOCOL 61 (2019), https://store.samhsa.gov/sites/default/files/d7/priv/tip_61_aian_full_document_020419_0.pdf (hereinafter SAMHSA TIP). This guide "helps behavioral health service providers identify how and to what extent an individual's cultural background can affect his or her needs and concerns." *Id.* at 6. This competency is important because "Native American individuals have historical cause to wonder whether behavioral health service providers will recognize them for who they are, respect them, and offer assistance in walking their life path." *Id.* at 7.

[2] Referring to April's recent behaviors and indications as testified to by Jennifer Oxford, the qualified Indian Child Welfare Act (ICWA) expert, the superior court found that "some of those expressions may be more recently stated in order to assist with [April's] own motivations to leave Provo Canyon." And April explained that she would prefer to live with her mother because her mother would "help [her] the most emotionally": "She's nicer, she has more patience, she takes me out fishing or something that's real nice." April's mother also explained how the start of fishing season would be a "perfect time" to "rehabilitate" April. Looking at these potential cultural cues, I

(continued...)

Though the court correctly notes that the superior court appears to have carefully considered the connection between April's mental health issues and her Native culture and social environment, I believe superior courts should be inclined to demand more of OCS in this context. And I have a particular concern about OCS potentially taking unfair advantage of today's holding — presenting cases without helpful testimony concerning Native cultural and social practices — because egregious facts, in a cultural vacuum, seem to meet the "limited exception" to cultural relevance.

---

[2]        (...continued)
wonder if the superior court considered whether what OCS referred to as "cultural loss" actually is tied to assessing April's treatment needs. "For many behavioral health issues (e.g., substance abuse, suicidality), the underlying cause may be the loss of connection to traditional native culture, historical trauma, and conflict between native and mainstream culture." SAMHSA TIP, *supra* note 1, at 46. As the SAMHSA TIP explains:

> Maintaining ties to one's culture can help to prevent and treat substance use and mental disorders; thus, healing can come from reconnecting. Through reconnection to native communities and traditional healing practices, an individual may reclaim the strengths inherent in traditional teachings, practices, and beliefs and begin to walk in balance and harmony. In translating this belief into practice, initial interviews and assessments need to be culturally responsive (e.g., inquiring about the client's involvement in traditional and healing practices).

*Id.* at 9. Given information such as this, it would not be surprising that a mental health expert not taking a culturally competent approach would fail to appreciate traditional Native remedies and activities, consequently providing the court an incomplete picture of an Indian child's situation. I believe there probably was room to at least consider how April's mother and tribe might address April's needs if she returned to Kotzebue to live with her mother. Because understanding these cultural elements can only benefit courts, we should be extremely wary of exceptions to the rule that an ICWA expert should be competent about tribal culture, customs, and practices.

April raises an excellent point, unaddressed by the court, that determining culture to be "plainly irrelevant" based on testimony of an expert with absolutely no cultural knowledge may rest on hopelessly circular logic. And in this context the "limited exception" rule seems to place the onus on Native families to prove cultural implication.[3] This raises significant concerns about fairness and access to justice.[4] The burden is on OCS to provide potentially relevant cultural information, allowing the court to properly examine the question in the context of "the prevailing social and cultural standards of the Indian child's Tribe."[5] For example, in this case OCS could have presented Oxford's testimony along with testimony from someone competent to testify about Native Village of Kotzebue's customs and practices regarding tribal members' mental health issues.[6]

---

[3]     *See, e.g., Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 291 P.3d 957, 964 (Alaska 2013) ("[The mother] does not argue that her case is different, and she points to nothing to suggest that cultural issues or cultural bias played a role in OCS's actions, in [the] expert witness['s] testimony, or in the superior court's decision to terminate her rights."); *Payton S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 349 P.3d 162, 172 (Alaska 2015) ("But [the mother's] assertion that '[c]ultural mores and society were implicated in this termination trial' does not appear to have been raised in the trial court, and she presented no evidence to support it." (second alteration in original)).

[4]     *See* Elizabeth Low, *Keeping Cultural Bias Out of the Courtroom: How ICWA "Qualified Expert Witnesses" Make a Difference*, 44 AM. INDIAN L. REV. 43, 56-60 (2019) (describing several reasons tribes may face difficulties producing qualified witnesses, including travel, language, and cost barriers).

[5]     *See* 25 C.F.R. § 23.122(a) (2019).

[6]     *See In re Candace A.*, 332 P.3d 578, 584 (Alaska 2014) ("We have held that the required expert testimony may be aggregated with other expert testimony or with the testimony of lay witnesses to support the conclusion that a parent's continued custody of the child is likely to cause the child serious harm.").

I do not dispute that the ICWA regulation provides that, in limited circumstances, ICWA experts need not be knowledgeable about Native cultural and social practices to assess risk for a child's return to a family.[7] But this does not override ICWA's underlying concerns. The court seems to agree that state courts generally are not well positioned to determine when Native culture is or is not implicated. Though the court stresses the need for "extreme caution" in making this determination, I am not confident that such caution is sufficient, even for a well-meaning superior court, particularly when counterbalanced by difficult facts like those in this case. The difficulty of these issues alone does not quash Congress's emphasis on contextualizing an Indian child's needs. Regardless whether the outcome would be the same with testimony about Native cultural and social practices, standardizing and reinforcing expectations for culturally informed testimony would create and maintain a worthwhile safeguard. Doing so would emphasize OCS's responsibility and ultimately allow courts to better, and more fairly, adjudicate difficult questions in the spirit of ICWA's regulations and guidelines.

---

[7] *See* 25 C.F.R. § 23.122(a).