NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| TRISHA D., | ) |
| | ) Supreme Court No. S-17696 |
| Appellant, | ) |
| | ) Superior Court Nos. 3PA-16-00028/ |
| v. | ) 00029/00030/00031 CN |
| | ) |
| STATE OF ALASKA, DEPARTMENT | ) MEMORANDUM OPINION |
| OF HEALTH & SOCIAL SERVICES, | ) AND JUDGMENT* |
| OFFICE OF CHILDREN'S SERVICES, | ) |
| | ) No. 1807 – December 9, 2020 |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Kari Kristiansen, Judge.

Appearances: Dan Bair, Law Office of Dan Bair, Anchorage, for Appellant. Katherine Demarest, Assistant Attorney General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for Appellee. Rachel Levitt, Assistant Public Advocate, and James Stinson, Public Advocate, Anchorage, for Guardian Ad Litem.

Before: Bolger, Chief Justice, Winfree, Maassen, and Carney, Justices.

## I. INTRODUCTION

The superior court terminated a mother's parental rights to her three Indian children based primarily on concerns with the mother's severe mental illness, her failure

---

\* Entered under Alaska Appellate Rule 214.

to effectively treat it, and its impact on her children. The mother appeals, arguing that the superior court erred in finding that the Office of Children's Services (OCS) made active efforts to prevent the breakup of the family and by relying on the testimony of an expert who the mother argues did not meet the standard for expert testimony under the Indian Child Welfare Act (ICWA). We conclude that the superior court did not clearly err in its active efforts finding and that it properly relied on the testimony of the challenged expert. We therefore affirm the termination of the mother's parental rights.

## II.    FACTS AND PROCEEDINGS

Trisha D. is the mother of four daughters, Ingrid (the oldest), Anne, Violet, and Charlotte.[1]  This appeal concerns Trisha's parental rights to the three younger girls.[2] Anne and Violet are twins and were born in 2010; Charlotte was born in 2015. They are Indian children as defined in ICWA because of Trisha's tribal membership with the Native Village of Ambler.[3]  The family has experienced significant trauma, and OCS and other states' protective services departments had been in contact with the family before OCS assumed custody of the children in 2016.

### A.    Facts

In January 2016 Trisha had a "psychotic response" to methamphetamine and was taken to the hospital for an involuntary commitment evaluation. Experiencing

---

[1]     We use pseudonyms to protect the family's privacy.

[2]     Ingrid turned 18 during the termination trial in late 2019 and was released from OCS custody following a successful home visit with her father.

[3]     *See* 25 U.S.C. § 1903(4) (2018) (" 'Indian child' means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.")  Anne and Violet are also Indian children based on their father's tribal affiliation.

paranoid delusions and showing severe symptoms of acute psychosis, Trisha was diagnosed with major depression, amphetamine adverse reaction, amphetamine abuse (episodic), and opiate abuse (episodic). OCS took custody of the four children. Ingrid was fourteen, Anne and Violet were five, and Charlotte was an infant.

Trisha resumed meeting with a therapist she had been seeing earlier; the therapist observed that Trisha's mental health had declined since her earlier visits and she now had delusions and "persecutory thoughts and paranoia." After seeing Trisha for several months, the therapist "became concerned for her own safety and ended services." Trisha had a psychological evaluation later that year. The psychologist reported that Trisha was generally oriented to reality but also had delusional beliefs. She diagnosed Trisha with post-traumatic stress disorder, bipolar disorder with mood-congruent psychotic features, and an unspecified personality disorder.

OCS prepared a case plan. Its goals for Trisha were that she (1) become an educated parent through parenting classes; (2) engage in a substance abuse assessment and demonstrate sobriety though random substance screenings; and (3) demonstrate clear thought processes through engaging in a psychological evaluation — which the plan noted had already been completed — then following recommendations for psychiatric treatment and medication. Trisha made progress with some aspects of the case plan, but over the next few years she made little progress in dealing with her serious mental health issues.

The termination trial began in March 2019. After the first two days the superior court, at OCS's request, ordered a two-month continuance so that OCS could make "intense efforts" to help Trisha accomplish her case plan goals. During these two months OCS focused on Trisha's goals of obtaining a substance abuse assessment, following its recommendations, and using available mental health services. The caseworker tried to schedule a mental health services appointment for Trisha at

Southcentral Foundation, but Trisha "said she would not work with them." Trisha then had a phone intake with a counseling service, for which OCS provided collateral information, but the service did not have immediate availability and referred Trisha elsewhere. OCS followed up with the referred provider, but he was also unable to help due to a lack of staff. OCS referred Trisha to Akeela House for an integrated mental health and substance abuse assessment; the OCS caseworker hand-delivered collateral information to Akeela House and helped schedule Trisha's appointment there. The assessment was completed on July 29, 2019, a day before trial recommenced, and an OCS caseworker picked up the report on July 31.

At the time of trial, Anne and Violet were living with their father. Charlotte was doing well in a prospective adoption placement with an Alaska Native family.

**B. The Termination Order**

In a written January 2020 order, the superior court terminated Trisha's parental rights to Anne, Violet, and Charlotte, finding the children to be in need of aid under AS 47.10.011(11) (parent's mental illness placing child "at substantial risk of physical harm or mental injury"). The court found that Trisha was "paranoid, delusional, unstable, and unable to safely assess dangers concerning her children" and that these mental health issues "continue[d] to prevent her from safely caring for her children." The court found that the children would remain at risk until Trisha successfully addressed her mental health needs and that so far she had "made no meaningful gains" in that direction.

The court further found that OCS had made active efforts to prevent the breakup of the family but that Trisha's "unwillingness to meaningfully engage . . . excuse[d] any limited failing of [OCS] to provide consistent active efforts." The court found that Trisha's "antagonistic temperament and difficulty interacting with others continue[d] to present barriers toward managing her mental health." And it found that

the children were likely to suffer substantial harm if returned to Trisha's care. In reaching this conclusion the court relied on the testimony of the psychologist who performed the 2016 psychological evaluation and Jaime Browning, a licensed social worker. The court found that although Browning was not an expert in the culture of the Native Village of Ambler, she was still qualified to render an opinion on whether Trisha's continued custody of the children would likely result in serious emotional or physical harm.

Trisha appeals the superior court's finding of active efforts and its determination that Browning was a qualified expert witness for purposes of ICWA.

## III. STANDARDS OF REVIEW

"Whether OCS made active efforts to provide remedial and rehabilitative services to reunify the family as required by ICWA is a mixed question of law and fact. We review the content of the superior court's findings for clear error, but we review de novo whether those findings satisfy the requirements of the CINA rules and ICWA."[4] "We review de novo the court's conclusions of law, such as whether the superior court's findings and the expert testimony presented at trial satisfy the requirements of ICWA."[5]

## IV. DISCUSSION

### A. The Superior Court Did Not Clearly Err In Finding That OCS Made Active Efforts To Prevent The Breakup Of The Family.

In proceedings to terminate parental rights, ICWA requires proof by clear and convincing evidence that "active efforts have been made to provide remedial

---

[4] *Philip J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 314 P.3d 518, 526 (Alaska 2013) (citations omitted).

[5] *Eva H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 436 P.3d 1050, 1052 (Alaska 2019) (quoting *Bob S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 400 P.3d 99, 105 (Alaska 2017)).

services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[6] Bureau of Indian Affairs regulations define active efforts as "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family."[7] Whether efforts were active is determined on a case-by-case basis.[8] "Generally we will find that active efforts have been made where OCS 'takes the client through the steps of the plan for reunification of the family' but decline to find active efforts where 'OCS develops [a] case plan, but the client must develop his or her own resources towards bringing it to fruition.' "[9]

"[T]he active efforts requirement does not require perfection. Our concern is not with whether [OCS's] efforts were ideal, but with whether they crossed the threshold between passive and active efforts."[10] The court looks "to OCS's 'involvement in its entirety,' and may consider a parent's demonstrated unwillingness to participate in treatment as a factor in determining whether OCS met its active efforts burden."[11] We

---

[6]     25 U.S.C. § 1912(d) (2018); CINA Rule 18(c)(2)(B); *accord Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 760-61 (Alaska 2009).

[7]     25 C.F.R. § 23.2 (2019).

[8]     *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1114 (Alaska 2010).

[9]     *Id.* (alteration in original) (quoting *Wilson W. v. State, Office of Children's Servs.*, 185 P.3d 94, 101 (Alaska 2008)).

[10]     *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 272 (Alaska 2011).

[11]     *Id.* at 271 (quoting *Dale H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 235 P.3d 203, 213 (Alaska 2010)).

have held that "[f]ailed attempts to contact the parent or obtain information from [him or] her may qualify as active efforts if the parent's evasive or combative conduct 'rendered provision of services practically impossible.' "[12]

In its written findings and conclusions, the superior court identified the efforts OCS made throughout the duration of the case. These included creating and periodically updating case plans for Trisha; arranging supervised visits between her and the children and supervising the visits when outside supervisors were unavailable; providing bus passes and cab vouchers; referring and paying for a psychological evaluation; identifying health care providers to assist Trisha with treatment; making referrals to providers and providing collateral information to those providers; scheduling random substance screenings; and referring Trisha for a substance abuse assessment. The court noted that OCS also worked with the girls' fathers to facilitate placements with them.[13]

The court also found, however, that Trisha "ha[d] been uncooperative with — and occasionally hostile toward — [OCS] and its social workers."[14] It found that she had published communications that OCS intended to be confidential, refused to provide OCS with basic information necessary for referrals and treatment, and refused

---

[12]     *Sylvia L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 343 P.3d 425, 433 (Alaska 2015) (quoting *E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 990 (Alaska 2002)).

[13]     *See Caitlyn E. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 399 P.3d 646, 656 (Alaska 2017) ("Courts may also consider OCS's efforts toward the family as a whole in evaluating active efforts."), *superseded by regulation on other grounds as recognized in Oliver N. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 444 P.3d 171, 177 (Alaska 2019).

[14]     The superior court noted that Trisha had once filed a police report against her assigned case worker "for no identifiable reason."

to identify Charlotte's father and some of the counselors and care providers she was seeing. It found that her lack of cooperation had effectively "prevented [OCS] from evaluating whether her home [was] suitably safe for children."

Trisha does not challenge these factual findings; her argument is focused on OCS's failure to notify her of the need for an enhanced psychological evaluation. The argument's factual setting is as follows. After Trisha's integrated mental health and substance abuse assessment at Akeela House, completed in July 2019 (as the termination trial resumed), the assessment counselor orally advised the OCS caseworker that Trisha's next step should be an enhanced psychological evaluation with a licensed clinical psychologist. This recommendation, however, did not make it into the report given to Trisha, and Trisha notes the absence of evidence that the OCS caseworker communicated the recommendation to her in any other way. She argues, therefore, that after the integrated assessment she had no reason to know that OCS still expected her to undergo an additional psychological evaluation, meaning that she was in compliance with her case plan at the time her parental rights were terminated.

This alleged failure on OCS's part occurred during the termination trial.[15] As OCS points out, "psychiatric treatment had at that point been the key goal on Trisha's case plan for three years," but she had consistently resisted OCS's attempts to acquire information relevant to her mental health and had made no significant progress despite OCS's efforts. Any lapse in OCS's efforts in this one instance does not negate the active efforts OCS provided over the preceding three years, nor does it undercut the court's findings about Trisha's consistent resistence to treatment. "[T]he active efforts

---

[15] As noted above, the assessment was completed on July 29, 2019, and the OCS caseworker picked up the written report on July 31, then picked up an amended report about a week later. Trial was held on July 30, August 30, September 25, and October 29 after being continued in March.

requirement does not require perfection,"[16] and we "look to OCS's 'involvement in its entirety.' "[17] The superior court did not err in finding that OCS made active efforts to prevent the breakup of the family.

**B.** **The Superior Court Did Not Err In Deciding That Browning Was A Qualified Expert Witness For ICWA Purposes.**

Before parental rights can be terminated in an ICWA case, OCS must prove "by evidence beyond a reasonable doubt, *including testimony of qualified expert witnesses*, that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child."[18] A qualified expert witness *must* be able to testify about whether the child's continued custody by the parent is likely to result in serious emotional or physical damage to the child and *should* be able "to testify as to the prevailing social and cultural standards of the Indian child's Tribe."[19] "[T]he ability to testify about 'the prevailing social and cultural standards' is not essential in every case."[20] "When the basis for termination is unrelated to Native culture and society and when any lack of familiarity with cultural mores will not influence the termination

---

[16]  *Pravat P.*, 249 P.3d at 272.

[17]  *Id.* at 271 (quoting *Dale H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 235 P.3d 203, 213 (Alaska 2010)).

[18]  25 U.S.C. § 1912(f) (2018) (emphasis added); CINA Rule 18(c)(4). This requires evidence that the parent's conduct is likely to harm the child and that the parent's conduct is unlikely to change. *Diana P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 355 P.3d 541, 546 (Alaska 2015).

[19]  *See* 25 C.F.R. § 23.122(a) (2019).

[20]  *Eva H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 436 P.3d 1050, 1054 (Alaska 2019).

decision or implicate cultural bias in the termination proceeding," an ICWA expert need not be familiar with Native culture.[21]

The superior court recognized Browning, a licensed social worker, as an expert in the area of child maltreatment. Browning testified that she had a master's degree in social work; had worked as an OCS social worker for almost 12 years; and had received "extensive" training on cultural competence, particularly involving Alaska Natives. She testified that she was familiar with the culture of the Iñupiaq, both through training and having lived with an Iñupiaq family. But she specifically disavowed any particular expertise in the prevailing social and cultural practices of the Native Village of Ambler. The court nonetheless relied on Browning's testimony as supporting termination under ICWA, finding that Trisha could not "safely parent the children at this time" and that "returning the children to [Trisha's] care would place them at risk for emotional or physical harm."

An expert witness for ICWA purposes must have an "expertise beyond normal social worker qualifications."[22] Trisha does not dispute that Browning had this level of expertise; in fact, we have recognized Browning's qualifications before.[23] Trisha

---

[21] *Marcia V. v. State, Office of Children's Servs.*, 201 P.3d 496, 503 (Alaska 2009) (finding no error in relying on testimony of ICWA expert who had no familiarity with Native culture when there was evidence of mother's addictions, violence, incarceration, inability to provide stable home, neglect, exposure of child to sex offenders, and abandonment).

[22] *Eva H.*, 436 P.3d at 1054 (quoting U.S. DEP'T OF THE INTERIOR, GUIDELINES FOR IMPLEMENTING THE INDIAN CHILD WELFARE ACT 54 (2016), https://www.bia.gov/sites/bia.gov/files/assets/bia/ois/pdf/idc2-056831.pdf).

[23] *See Addy S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, No. S-17427, 2020 WL 915975, at *5 (Alaska Feb. 26, 2020) ("By any measure, Browning's education, training, and work experience — including 12 years at OCS as (continued...)

argues, rather, that Browning is not a qualified ICWA expert in this case because of her lack of expertise related specifically to the Native Village of Ambler. OCS counters that social and cultural norms are not implicated by Trisha's mental health issues — particularly her "severe paranoia and disconnect from reality" — and the threats they pose "to these specific children." OCS suggests that "[s]erious untreated mental illness, like sexual abuse, is not something that cultural practices can buffer in the way a village might help children thrive despite poverty, single parenthood, substance abuse," or other situational disadvantages identified in ICWA regulations.

We recently addressed a similar issue in *In re April S.*[24] A minor in OCS custody was placed in a residential treatment facility because of her extreme self-harm behaviors.[25] As is the case here, OCS was required to present expert testimony regarding the risk of harm, and the superior court determined that a therapist satisfied the ICWA standard although she lacked expertise in Alaska Native culture.[26] We affirmed the superior court's decision, agreeing that the expert "did not need to have expertise in Native culture to determine that April had severe mental health disorders that would

---

[23]    (...continued)
a family services caseworker, supervisor, and ICWA family services supervisor — as well as her prior experience as an ICWA expert in the areas of child neglect, child welfare, and child development, suffice to qualify her as an expert in the areas of child safety and development."); *Julio A. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, No. S-17603, 2020 WL 4497830, at *7 (Alaska Aug. 5, 2020) (concluding that Browning was qualified as expert in child safety and development for ICWA purposes).

[24]    467 P.3d 1091 (Alaska 2020).

[25]    *Id.* at 1093.

[26]    *Id.* at 1094-96.

present a danger to herself and others outside of a secure residential treatment facility."[27] Justice Winfree, joined by Justice Carney, concurred, but he emphasized that it was OCS's burden "to provide potentially relevant cultural information [that would allow] the court to properly examine the question in the context of 'the prevailing social and cultural standards of the Indian child's Tribe.' "[28] Justice Winfree further observed "that determining culture to be 'plainly irrelevant' based on testimony of an expert with absolutely no cultural knowledge may rest on hopelessly circular logic."[29]

This case implicates these concerns. Browning, though experienced with Iñupiaq culture generally, disclaimed any expertise in the more specific tribal culture at issue and thus lacked the ability to state with authority that the tribe's cultural and social standards were not implicated. We have previously determined that familiarity with a child's tribe was not necessary when termination was based on parental substance abuse,[30] domestic violence,[31] or neglect.[32] We have not included parental mental illness

---

[27]     *Id.* at 1099.

[28]     *Id.* at 1100 (Winfree, J., concurring) (quoting 25 C.F.R. § 23.122(a) (2019)).

[29]     *Id.*

[30]     *See Payton S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 349 P.3d 162, 172 (Alaska 2015); *Thea G. v. State, Dep't of Health & Soc. Servs, Office of Children's Servs.*, 291 P.3d 957, 964 (Alaska 2013) ("Our decisions indicate that, in general, cases involving issues of parental substance abuse do not implicate cultural mores.").

[31]     *See Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1110-11 (Alaska 2011).

[32]     *L.G. v. State, Dep't of Health & Soc. Servs.*, 14 P.3d 946, 954 (Alaska 2000) ("Given the clear evidence of physical neglect, termination of [the mother's] (continued...)

in this category; parental mental illness may run the gamut in terms of its severity, manageability, and impact on others. And we reiterate that the exception is "very limited."[33]

We conclude, however, that the case before us is one in which "any lack of familiarity with cultural mores will not influence the termination decision or implicate cultural bias in the termination proceeding."[34] The superior court made unchallenged findings about the seriousness of Trisha's mental illness, including delusions and paranoia; her persistent failure to effectively treat her illness; her resulting inability to "safely assess dangers for her children"; and the fact that the children had already "experienced serious trauma while in [Trisha's] care." These facts make the case indistinguishable in any meaningful way from *April S.*, in which the seriousness of the mental illness and the severity of the harm likely to result from it were likewise obvious.[35] We therefore conclude that the superior court did not err by relying on Browning's expert testimony to satisfy the ICWA standard.

V.    CONCLUSION

We AFFIRM the order terminating Trisha's parental rights.

---

[32]    (...continued)
parental rights did not require testimony from an expert in Native culture.").

[33]    *April S.*, 467 P.3d at 1099 (majority opinion).

[34]    *Marcia V. v. State, Office of Children's Servs.*, 201 P.3d 496, 503 (Alaska 2009).

[35]    *April S.*, 467 P.3d at 1093.