*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| STATE OF ALASKA, DEPARTMENT OF HEALTH & SOCIAL SERVICES, OFFICE OF CHILDREN'S SERVICES, | ) ) ) ) | Supreme Court Nos. S-18088/18092 (Consolidated) |
| Appellant, | ) ) | Superior Court No. 4FA-18-00167 CN |
| v. | ) | O P I N I O N |
| CISSY A. and BUTCH R., | ) ) | No. 7604 – July 22, 2022 |
| Appellees. | ) ) ) | |
| STATE OF ALASKA, DEPARTMENT OF HEALTH & SOCIAL SERVICES, OFFICE OF CHILDREN'S SERVICES, | ) ) ) ) | |
| Appellant, | ) ) | Superior Court Nos. 4FA-19-00027/ 00028 CN |
| v. | ) ) | |
| LINETTE S. and MARQUIS D., | ) ) | |
| Appellees, | ) ) | |
| NENANA NATIVE VILLAGE, | ) ) | |
| Intervenor- Appellee. | ) ) ) | |

Appeals from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Earl A. Peterson, Judge.

Appearances: Mary Ann Lundquist, Senior Assistant Attorney General, Fairbanks, and Treg R. Taylor, Attorney General, Juneau, for Appellant. Julia Bedell, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Appellees Cissy A. and Marquis D. Kristin J. Farleigh, Jason Weiner & Associates, P.C., Fairbanks, for Appellee Butch R. Christopher J. Bodle, Jason Weiner & Associates, P.C., Fairbanks, for Appellee Linette S. Savannah Fletcher, Alaska Legal Services Corporation, Fairbanks, and Pearl E. Pickett, Alaska Legal Services Corporation, Anchorage, for Intervenor-Appellee Nenana Native Village. Margaret McWilliams, Assistant Public Advocate, Juneau, and James Stinson, Public Advocate, Anchorage, for Guardian Ad Litem.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

PER CURIAM.

## I. INTRODUCTION

The Indian Child Welfare Act (ICWA) prohibits a state court from terminating parental rights to an Indian child unless there is proof beyond a reasonable doubt that continued custody by the parent is likely to cause serious damage to the child. This proof must include testimony by a qualified expert witness. An expert witness *should*, according to regulations by the federal Bureau of Indian Affairs (BIA), be qualified to testify about the prevailing social and cultural standards of the Indian child's tribe. But the BIA has also stated that this cultural expert testimony is not always required. These consolidated appeals concern how the superior court determines when cultural expert testimony is needed and when this testimony is adequate in a particular case.

In two separate cases the superior court decided that it could not terminate parental rights without cultural expert testimony and that the cultural expert testimony presented was too vague and generalized to be helpful. Although it was error to construe our precedent to require cultural expert testimony in every ICWA case, we affirm the court's decision to require expert testimony based on its explanation that it could not competently weigh the evidence of harm in these cases without cultural context. And because the cultural expert testimony presented did not provide a meaningful assessment of tribal social and cultural standards and was not grounded in the facts of these particular cases, we hold the court did not clearly err by giving the testimony no weight. We therefore affirm its decision to deny termination of parental rights in each case.

## II.  FACTS AND PROCEEDINGS

This opinion addresses two cases in which the superior court made similar determinations. We first summarize the facts and proceedings of each case separately; we then summarize the superior court's conclusions jointly.

### A.  Cissy A. And Butch R.

Cissy A. and Butch R. are the parents of Howie R., born in 2018.[1] Cissy is a member of the Native Village of Barrow and Howie is an Indian child for purposes of ICWA.[2]

Cissy and Butch struggled with substance abuse and domestic violence within their relationship both before and after Howie's birth. Butch has an extensive

---

[1]    We use pseudonyms for all family members in both cases to protect their privacy.

[2]    ICWA defines "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4).

history of domestic violence. Cissy's substance use prenatally exposed Howie to amphetamine, alcohol, and methamphetamine.

Howie was born prematurely and spent about three weeks in the neonatal intensive care unit to address his medical issues. OCS received a report that Howie had tested positive for various substances at birth. After speaking with Cissy and Butch about their substance abuse, OCS assumed emergency custody. Howie now faces developmental and social delays and struggles with transitions, impulse control, and aggression.

OCS made efforts to help the parents remedy their conduct and to support reunification. OCS referred Butch to an alternatives to violence program, but he failed to attend any sessions until over a year and a half later. Similarly, Butch did not provide OCS-recommended urinalysis samples for approximately a year and a half during the pendency of the case. OCS referred Cissy to inpatient substance abuse treatment and facilitated a trial home visit with Howie while she was there. However, Cissy had contact with Butch while Howie was in her care, and relapsed shortly after leaving treatment. After about a year and a half of case planning and attempts at reunification, OCS filed a petition to terminate both parents' rights.

OCS presented two expert witnesses at the termination trial: Dr. Martha Cranor, a licensed psychologist, and Edith Kaleak, an expert in the cultural values and practices of the Native Village of Barrow.

Dr. Cranor submitted an expert report and testified at trial regarding the likelihood of serious physical or emotional damage to Howie if he were to return to Cissy or Butch's care.[3] OCS emphasized that it was not offering Dr. Cranor as an expert in

---

[3] *See* 25 U.S.C. § 1912(f) ("No termination of parental rights may be ordered . . . in the absence of a determination, supported by evidence beyond a
(continued...)

tribal culture or practices, and no party objected to Dr. Cranor's classification as an expert in child welfare and parental risk assessment. To form her opinions, Dr. Cranor reviewed 605 pages of records, including OCS records, hospital records, visitation records, urinalyses, and police records.

Dr. Cranor indicated in her expert report that it was her "professional opinion that placement of [Howie] with either of his parents would place him at elevated risk for both physical and psychological harm." This opinion was based principally on the parents' substance use, Butch's domestic violence, and the parents' inconsistent visitation with Howie. Dr. Cranor asserted that Cissy's alcohol and drug use during pregnancy led to Howie's medical difficulties as an infant and his later developmental challenges. She also indicated that Cissy's substance use had "negatively impacted her ability to care for herself and provide for her own basic needs" and anticipated that Cissy's continued use would prevent her from effectively parenting Howie. Dr. Cranor used an actuarial risk assessment tool to assess future risk of harm to Howie from domestic violence, concluding it would be high were he returned to Butch's care, or to Cissy's care if she were in contact with Butch.

Referencing attachment theory in both her report and testimony, Dr. Cranor emphasized that the sporadic visitation between the parents and Howie made it challenging for Howie to develop relationships with either parent. She asserted that "[a]ttachment requires constant, day-in and day-out, mutually reinforcing and reciprocal interactions between the parental figure and the child, a process that is seriously disrupted by extended separations." Dr. Cranor explained that infrequent and

---

3 (...continued)
reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child.").

inconsistent visitation could result in Howie having "difficulty self-soothing and managing stress" and increased anxiety. She felt that Howie would be at risk of psychological harm if placed with his parents in part because of the attachment challenges.

Dr. Cranor also expressed some concern about the parents' physical living space and their economic situations in her report and testimony. For instance, during the trial she stated that the parents "didn't have an adequate living situation to care for a child who at that point was medically fragile and needed, you know, at least a home with reliable heat and preferably running water." Dr. Cranor's report also stressed that Cissy had an inconsistent employment history and "appears to have relied on family members, acquaintances, friends, romantic partners, community agencies, and/or tribal dividends for her financial support."

Kaleak, a 20-year family advocate for the Native Village of Barrow and a tribal member, testified without objection as an expert on the Tribe's "cultural practices . . . and traditions." However, neither the parties nor Kaleak had much time to prepare for her testimony. OCS provided notice of its intent to call Kaleak as an expert the day before trial. Kaleak received the petition to terminate parental rights at six o'clock the evening prior to her appearance, and was only able to review the material for ten minutes before testifying. She noted that she was "not . . . able to fully absorb" the petition.

OCS asked Kaleak just two substantive questions on direct examination. OCS first asked Kaleak to describe "the important cultural practices and traditions" of the Native Village of Barrow. Kaleak stated that the Tribe's traditional practices include hunting, gathering, and a focus on communal welfare. OCS next asked Kaleak whether the Tribe's "cultural norms, traditions, or values" included substance use, domestic violence, or neglect. Kaleak responded "No," and said that such conduct would trigger the intervention of the Tribe's own child protective services.

On cross-examination, Cissy drew out a bit more information concerning tribal practices in situations involving child welfare concerns. Kaleak indicated that when the Tribe gets involved in a child welfare case, it works to prevent removal of a parent from the community to provide the child with continued access to the parent; the Tribe also works to include extended family and tribal leaders in the process. She testified that to her knowledge that had not happened in this case. When asked about the purposes of ICWA, she explained that ICWA was enacted to protect "Alaska Native Indian children from being taken from their families" and "to protect the cultural ties with the children and their families" in light of the trauma caused by widespread forcible removal of Indian children from their families and placement in government-run boarding schools.[4] Kaleak testified about the trauma that a child could experience if removed from the family as an infant, noting that the child is "being removed from their identity" and that it would negatively impact that child's sense of self.

At the conclusion of the termination trial, the superior court found by clear and convincing evidence that Howie was a child in need of aid under several of the categories set forth in AS 47.10.011: substantial physical harm or risk thereof, substantial risk of mental injury, and substance abuse.[5] The court further found that

---

[4]    *See* Maria Yellow Horse Brave Heart & Lemrya M. DeBruyn, *The American Indian Holocaust: Healing Historical Unresolved Grief*, 8 AM. INDIAN & ALASKA NATIVE MENTAL HEALTH RES. 60, 63-66 (1998) (detailing the trauma caused by forcible removal of Native American and Alaska Native children); Zachariah Hughes, *Inside a Modern Alaskan Boarding School*, MOTHER JONES (Sept. 13, 2019), https://www.motherjones.com/politics/2019/09/inside-the-alaskan-boarding-school-trying-to-overcome-its-history-by-embracing-indigenous-students/ (describing forcible removal of Alaska Native children and current efforts in Alaska Native education).

[5]    AS 47.10.011(6) (physical harm), (8) (mental injury), (10) (parental substance abuse). The superior court also found Howie to be a child in need of aid due
(continued...)

Cissy and Butch failed to remedy the conduct that placed Howie in need of aid and that OCS made active efforts to help them remedy this conduct. It also found that termination of parental rights was in Howie's best interests.

### B.    Linette S.

Linette S. and Marquis D. are the parents of Morris, born in 2011, and Irwin, born in 2013. Linette is a member of the Native Village of Selawik. Marquis is a member of the Nenana Native Village. Both children are Indian children for purposes of ICWA.

Linette has struggled with alcohol and methamphetamine abuse for many years. OCS initially removed Morris and Irwin in 2015 due to Linette's methamphetamine use, but the children were returned to Linette in the fall of 2016. Linette also has a history of violent outbursts in front of her children and has been arrested several times for domestic violence.

Both children have special needs. Among other developmental issues, Morris has a growth deficiency due to a history of malnutrition and as a result requires frequent medical care and a special diet. Both children were diagnosed with Fetal Alcohol Spectrum Disorder, and Irwin was also diagnosed with Autism Spectrum Disorder.

In 2019 OCS received reports that Linette was acting erratically and violently and that she was neglecting the children. An OCS specialist spoke with Linette, and based on her incoherent speech, OCS believed Linette was again using methamphetamine. OCS assumed emergency custody of Morris and Irwin.

---

[5]    (...continued)
to neglect under AS 47.10.011(9). However, the court did not analyze this conduct as it did for substantial physical harm, risk of mental injury, or substance abuse.

OCS made efforts to support reunification. But Linette did not address her substance abuse or mental health issues. Linette did not regularly attend scheduled visitation with her children and missed appointments for services that OCS had arranged for her. Linette was also arrested for assaulting her father with an axe and for assaulting Marquis with her car. OCS continued to try to engage Linette while she was incarcerated. After over a year of case planning with both parents and seeing insufficient progress, OCS filed a petition to terminate Linette's and Marquis's parental rights. OCS's petition was based on parental substance abuse, neglect, abandonment, parental mental illness, and domestic violence.[6]

At Linette's termination trial,[7] OCS initially presented just one expert witness, Dr. Martha Cranor — the same expert witness that OCS presented in Cissy and Butch's trial. Dr. Cranor was qualified without objection as an expert in child welfare and parental risk assessment. She submitted an expert report and testified regarding the likelihood of serious physical or emotional damage to the children if they were to return to Linette's care. After reviewing 422 pages of records, she concluded that there was a high likelihood of serious physical or emotional harm to the children if returned to Linette. Her opinions were based on Linette's history of substance abuse and abandonment of the children; she also considered the children's special needs and malnourishment. As in Cissy and Butch's trial, Dr. Cranor referenced attachment theory in her testimony and opined that both children were no longer connected to Linette. In her report, Dr. Cranor also expressed concern about Linette's economic situation,

---

[6]     AS 47.10.011(1), (8)-(11).

[7]     Linette's trial did not address Marquis's parental rights. The record does not reveal the status of his termination trial, but he is an appellee in this case pursuant to Alaska Appellate Rule 204(g).

highlighting Linette's reliance on "her father, acquaintances, friends, romantic partners, or community agencies for her support."

After Dr. Cranor concluded her testimony, OCS stated its intent to rest its case. But the superior court cautioned OCS that "this is an ICWA case" and that OCS had "offered no evidence on the elements of cultural practice." OCS responded that "[n]one of th[e issues in Linette's case] would suggest that . . . cultural practices . . . have been indicated." The GAL requested that the case stay open so that OCS could present cultural expert testimony, which the court allowed.

The following day of the trial, OCS presented two more witnesses. Tanya Ballot, the tribal administrator for Linette's Tribe, was accepted as an expert in the social and cultural standards of the Native Village of Selawik. Virginia Charlie, formerly a tribal judge for Marquis's Tribe, testified about the social and cultural standards of the Nenana Native Village. Neither witness was given much time to prepare.[8] OCS had not timely sent any case documents to either witness to prepare their testimony. Ballot thus had little knowledge about the facts of Linette's case. Charlie had some knowledge about Linette's prior OCS case because she was a tribal judge at that time, but Charlie acknowledged that that case had occurred "years and years ago" and that she had not been provided any documentation to review about the family before testifying.

As in Cissy and Butch's trial, OCS asked each cultural expert witness just a handful of substantive questions. OCS asked Ballot if she could describe the "prevailing cultural values with regard[] to child-raising that might be unique to" her Tribe. Ballot explained some general values of her Tribe, including "respect [for]

---

[8] Although OCS had indicated its intent to call other expert witnesses qualified to testify about the cultural standards of the Nenana Native Village and the Native Village of Selawik several months ahead of trial, Ballot and Charlie received extremely short notice to appear at trial.

elders," "learn[ing] subsistence lifestyles," and "[s]taying sober as best as possible." Next, OCS asked whether "drug abuse, neglect, abandonment, mental illness, and domestic violence" were "outside of the cultural values for [her] community." Ballot responded, "Yes." OCS then asked whether Ballot had "any concerns that these children ha[d] been removed . . . because of any kind of violation of those cultural values in [her] community." She responded, "I do have some — I do have maybe a question or two," including whether Linette had "been able to do any effort in regards to trying to work on getting [her] kids back." OCS stated that it could not answer those questions during the trial and concluded the examination.

When OCS examined Charlie, it asked if her Tribe had a "prevailing cultural value . . . to keep children safe," and Charlie agreed that this was a prevailing cultural value. OCS then asked whether issues like substance abuse and domestic violence were "not in line with the cultural values" of her Tribe. Charlie confirmed that such conduct was not consistent with tribal values.

After the termination trial the superior court found by clear and convincing evidence that the children were in need of aid based on substance abuse, abandonment, substantial risk of physical harm due to Linette's violence and substance abuse, and substantial risk of mental injury due to Linette's failure to provide for the children's heightened needs.[9] The court also found that Linette had failed to remedy the conditions that placed the children in need of aid and that OCS had made active efforts toward reunification. The court further found that terminating parental rights would be in the children's best interests.

---

[9] AS 47.10.011(1) (abandonment), (6) (physical harm), (8) (mental injury), (10) (parental substance abuse).

## C.     The Superior Court's Rulings On Cultural Experts

Although the superior court made many of the requisite findings for termination, it found that it could not terminate parental rights in either case because OCS had failed to properly contextualize the cases within the culture and values of the children's Tribes.  Citing our decision in *Oliver N. v. State, Department of Health & Social Services, Office of Children's Services*,[10] the court stated that there is a "requirement that a tribal expert testify before parental rights are terminated" and that tribal experts must "be qualified to testify about the likelihood of harm to the child if returned to the parent's custody."  The court emphasized that relevant cultural expert testimony would have assisted the court in determining, beyond a reasonable doubt, whether the children were likely to suffer serious damage if returned to their parents.

The court explained that though the experts presented by OCS had expertise regarding their respective Tribes, their testimony was insufficient "without knowledge and application to" the particular families.  The court wanted to hear in-depth testimony "about the specifics of [the experts'] tribal values," and noted that the testimony presented was not based on the particular facts of each case.  The court emphasized that expert testimony "should not be taken as a mere formality, but as a concrete showing, requiring the highest standard of testimony, of the tribal values as applied to the family in the case."

Finding this standard had not been met, the court indicated it "c[ould not] in good faith terminate with the testimony that was presented."  The court invited OCS to "supplement the testimony already provided with the appropriate expert testimony."

OCS filed a motion for reconsideration in each case, both of which the superior court denied.  The court explained that the cultural expert testimony "did not

---

[10]     444 P.3d 171 (Alaska 2019).

help this court, the trier of fact, further understand this case and the tribal values that are to be understood and factored into the decision herein." The court indicated that it would have liked to hear testimony describing how the Tribes address substance abuse or assist families. It stressed that without this kind of testimony, "[t]he court was left with so many unanswered questions regarding the interaction of the Tribe and its norms with the pertinent allegations herein that frankly the court was surprised at the brief and cursory treatment this presentation made on this case."

OCS appealed both cases. The Nenana Native Village, Marquis's Tribe, intervened on appeal in Linette's case.

## III. STANDARD OF REVIEW

"Whether substantial evidence supports the court's conclusion that . . . children would likely be seriously harmed if they were returned . . . is a mixed question of fact and law."[11] We review de novo the superior court's conclusions of law,[12] including the interpretation of ICWA and BIA regulations.[13] We review the superior court's factual findings for clear error, giving the underlying allocations of weight to testimony special deference.[14]

---

[11] *J.A. v. State, Div. of Fam. & Youth Servs.*, 50 P.3d 395, 399 (Alaska 2002).

[12] *In re April S.*, 467 P.3d 1091, 1096 (Alaska 2020).

[13] *Kyle S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 309 P.3d 1262, 1267 (Alaska 2013); *Oliver N.*, 444 P.3d at 177 & n.19 (reviewing interpretation of BIA regulations de novo).

[14] *Danielle A. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 215 P.3d 349, 353 (Alaska 2009); *Pravat P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 249 P.3d 264, 274 (Alaska 2011); *Jon S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 212 P.3d 756, 762 n.16 (Alaska 2009).

## IV.    DISCUSSION

We begin by explaining ICWA's requirements for expert testimony and outlining the rare cases in which cultural expert testimony is not required.[15] We then clarify that the superior court erred by holding that *Oliver N.* mandates cultural expert testimony in every case.[16] However, given the superior court's stated inability to make an informed decision without this cultural expert testimony, we uphold the superior court's rulings requiring cultural expert testimony in these cases.

Turning to the sufficiency of the cultural expert testimony provided, we clarify that a cultural expert need not testify to the causal relationship between the parent's conduct and the risk of serious damage to the child. And we conclude that the court did not clearly err by affording no weight to the vague and generalized testimony presented in these cases. We therefore uphold the superior court's rulings in both cases.

### A.    ICWA Requires Testimony From A "Qualified Expert Witness," And Federal Regulations State That An Expert "Should" Be Qualified To Testify About Tribal Social And Cultural Standards.

A court may not terminate parental rights to an Indian child unless it finds "by evidence beyond a reasonable doubt, *including testimony of qualified expert witnesses*, that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child."[17] ICWA itself does not define

---

[15]    We use "cultural expert testimony" as a shorthand for what ICWA and the BIA regulations generally require: the "testimony of [a] qualified expert witness[]" who is "qualified to testify as to the prevailing social and cultural standards of the Indian child's Tribe." 25 U.S.C. § 1912(f); 25 C.F.R. § 23.122(a) (2022).

[16]    *Oliver N.*, 444 P.3d at 174-78.

[17]    25 U.S.C. § 1912(f) (emphasis added); CINA Rule 18(c)(4). This evidentiary burden requires OCS to show that the parent's conduct is likely to harm the
(continued...)

"qualified expert witness" or explain what testimony such a witness must provide.[18] But the BIA has adopted regulations that add specificity to the expert witness requirement (BIA Regulations),[19] commentary on the new regulations (BIA Commentary) that provides further insight,[20] and non-binding but persuasive guidelines (BIA 2016 Guidelines) on applying ICWA.[21]

The BIA Regulations explain what is needed to meet ICWA's "qualified expert witness" requirement:

> A qualified expert witness *must* be qualified to testify regarding whether the child's continued custody by the parent or Indian custodian is likely to result in serious emotional or

---

[17]    (...continued)
child and that the parent's conduct is unlikely to change. *Diana P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 355 P.3d 541, 546 (Alaska 2015). Other requirements are detailed in CINA Rule 18(c).

[18]    *See* 25 U.S.C. § 1912(f).

[19]    The BIA published non-binding guidelines in 1979 and again in 2015. Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,584, 67,593 (Nov. 26, 1979); Guidelines for State Courts and Agencies in Indian Child Custody Proceedings, 80 Fed. Reg. 10,146, 10,157 (Feb. 25, 2015). In response to public calls for formal and binding regulations, the BIA issued formal, binding regulations in 2016 to ensure the uniform application of ICWA across states. 25 C.F.R. §§ 23.1-.144 (2022); CINA Rule 1(f); Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38,778, 38,829, 38,851 (June 14, 2016) [hereinafter BIA Commentary].

[20]    BIA Commentary, *supra* note 19, at 38,829.

[21]    U.S. DEP'T OF THE INTERIOR, GUIDELINES FOR IMPLEMENTING THE INDIAN CHILD WELFARE ACT (2016), https://www.bia.gov/sites/bia.gov/files/assets/bia/ois/pdf/idc2-056831.pdf [hereinafter BIA 2016 Guidelines]; *see In re Adoption of F.H.*, 851 P.2d 1361, 1364 (Alaska 1993) (interpreting an earlier version and explaining that "[a]lthough the Guidelines do not have binding effect, this court has looked to them for guidance").

physical damage to the child and *should* be qualified to testify as to the prevailing social and cultural standards of the Indian child's Tribe.[22]

In its supporting guidelines and commentary, the BIA explained the importance of both the "must" and "should" prongs of its expert witness requirement. First, the BIA explained that the likelihood-of-damage qualification ensures that the expert can establish the causal relationship between the particular conditions of the home and the risk of damage to the child that is statutorily required for terminations.[23] The need to prove this link between the parent's conduct and harm to the child recognizes the fact that "children can thrive when they are kept with their parents, even in homes that may not be ideal . . . or when a parent is single, impoverished, or a substance abuser."[24]

Second, the BIA explained the importance of cultural context in informing a court's findings about the likelihood of serious damage to the child.[25] The BIA emphasized that Congress's purpose in passing ICWA was to "make sure that Indian child-welfare determinations are not based on 'a white, middle-class standard' "[26] — especially because "States have failed to recognize the essential Tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and

---

[22]    25 C.F.R. § 23.122(a) (emphasis added).

[23]    BIA Commentary, *supra* note 19, at 38,829; *see also* 25 C.F.R. § 23.121(b)-(d).

[24]    BIA 2016 Guidelines, *supra* note 21, at 53.

[25]    BIA Commentary, *supra* note 19, at 38,829.

[26]    *Id.* (quoting *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 36 (1989)).

families."[27]  Requiring cultural expertise "ensures that relevant cultural information is provided to the court and that the expert [causal relationship] testimony is contextualized within the Tribe's social and cultural standards."[28]

Yet the BIA also stated that cultural expert testimony is not "strictly" required in all cases.[29]  The BIA explained that while cultural expert testimony "should normally be required," it "may not be necessary if such knowledge is *plainly irrelevant* to the particular circumstances at issue in the proceeding."[30]  The BIA Commentary provides only one example where cultural expert testimony would be plainly irrelevant: when a parent "has a history of sexually abusing the child," "a leading expert on issues regarding sexual abuse of children may not need to know about specific Tribal social and cultural standards in order to testify . . . regarding whether return of a child to [that] parent . . . is likely to result in serious [harm]."[31]  Consistent with this guidance from the BIA, we have held that the exception to the requirement of cultural testimony is "very limited."[32]

---

[27]  *Id.*

[28]  *Id.*

[29]  *Id.* at 38,829-30.

[30]  *Id.* at 38,830 (emphasis added).

[31]  *Id.*

[32]  *In re April S.*, 467 P.3d 1091, 1099 (Alaska 2020).

**B.** **We Affirm The Superior Court's Ruling That Cultural Expert Testimony Was Needed To Help The Court Assess The Evidence Presented In These Cases.**

The superior court ruled it could not terminate parental rights in these cases without hearing expert testimony about tribal cultural and social standards. These rulings appear to rest on two grounds.

The court reasoned that our decision in *Oliver N.* mandates cultural expert testimony in all ICWA cases. This interpretation of *Oliver N.* was mistaken, as we explain below.

Yet it is clear from the superior court's initial orders and orders on reconsideration that the court also viewed cultural context as necessary to properly weigh the evidence presented by OCS in these particular cases. In other words, the court viewed cultural expert testimony as evidence necessary in each case to determine, beyond a reasonable doubt, that the children would truly be harmed if returned to their parents' custody.

OCS suggests that the superior court denied termination solely based on *Oliver N.*, pointing to the court's statement that OCS had "met [its] burden of proof for termination in all aspects except the tribal value expert testimony requirement." But the superior court indicated it could not draw any ultimate conclusions about the risk of serious damage to the children without cultural context. The court reasoned that cultural expert testimony was "necessary for the trier of fact to understand and consider the dynamic interplay of the tribal norms and standards with the parties, their actions, the allegations, and the rehabilitation efforts applicable to the situation." The scant cultural testimony presented by OCS left the court "with so many unanswered questions regarding the interaction of the [T]ribe and its norms with the pertinent allegations." Accordingly, we do not view the superior court's rulings to mean that OCS failed only

to check a box that was required for an otherwise-warranted termination. We instead view the superior court's rulings as concluding that without cultural expert testimony, the court could not confidently weigh the evidence presented in these cases and make the serious damage finding required under ICWA. And we hold that the court did not err in requiring expert testimony on this basis.

### 1. It was error to rule that expert testimony about tribal social and cultural standards is required in every ICWA case.

Our decision in *Oliver N.* did not require cultural expert testimony in every ICWA case. In *Oliver N.* OCS presented a single expert witness[33] who was qualified only as an expert on tribal cultural standards; the expert lacked the qualifications to opine on the causal relationship between the parent's conduct and damage to the child.[34] We held that under the BIA Regulations, OCS must always present testimony of an expert qualified to opine on causation.[35] We did not, however, hold that cultural expert testimony is also required in every case.[36]

In fact we have expressly acknowledged that the BIA Regulations do not require cultural expert testimony in every case. In *In re April S.* we noted the distinction between "must" and "should" in the BIA Regulations, explaining that while cultural expert testimony should be presented in most cases, it need not be presented in every

---

[33]     *Oliver N.* involved two separate cases consolidated for decision. *Oliver N. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 444 P.3d 171, 172 (Alaska 2019). OCS presented one expert witness in each case. *Id.* at 175-76.

[34]     *Id.* at 178-79.

[35]     *Id.*

[36]     *See id.* (holding that "in proceedings involving only *one* expert," the sole expert must be qualified to discuss causation and damage, but clarifying that when *two* experts are presented — a causation expert and a cultural expert — the cultural expert "does not need to be qualified to speak to the likelihood of harm" (emphases added)).

case.[37] This ruling is consistent with the BIA Commentary, which states that an "expert witness need not have specific knowledge of the prevailing social and cultural standards of the Indian child's Tribe . . . if such knowledge is plainly irrelevant to the particular circumstances."[38] The superior court erred in reading into *Oliver N.* a cultural expert testimony requirement without exception.

        **2.    The superior court did not err by determining that cultural expert testimony was necessary in these cases to find beyond a reasonable doubt that continued parental custody was likely to cause serious damage to the children.**

Next we address the other basis for the superior court's ruling: that it needed expert cultural testimony in order to properly weigh the evidence of harm to the children in these cases. Because witnesses and judges who may be unfamiliar with Alaska Native cultures are generally not well-equipped to know when evidence of harm rests on cultural assumptions that may not apply to Indian children, and because a judge cannot terminate parental rights unless convinced beyond a reasonable doubt, we hold that a superior court does not err if it determines that it needs cultural expert testimony to competently weigh the evidence in the particular case before it.

The scope of cases in which cultural expert testimony need not be presented is "very limited."[39] The BIA's choice of the word "should" indicates that, as a default rule, the need for cultural expert testimony is to be presumed.[40] The BIA in its

---

[37]    467 P.3d at 1098-99, 1098 n.29.

[38]    BIA Commentary, *supra* note 19, at 38,829-30.

[39]    *In re April S.*, 467 P.3d at 1099.

[40]    *See Should*, NEW OXFORD AMERICAN DICTIONARY (Angus Stevenson & Christine A. Lindberg eds., 3d ed. 2010) (describing that "should" is "used to indicate obligation, duty, or correctness").

commentary affirmed that cultural expert testimony "should normally be required."[41] And the BIA's express purpose for including a cultural expert testimony provision in the binding BIA Regulations — to ensure that ICWA decisions are not based on a "white, middle-class standard" — further supports viewing cultural expert testimony as a default requirement rather than a mere suggestion.[42]

The BIA Commentary elaborated on when a case might fall outside of the default requirement: cultural expert testimony "may not be necessary if such knowledge is plainly irrelevant to the particular circumstances at issue in the proceeding."[43] Although the BIA Commentary provides little guidance for determining when cultural expert testimony is "plainly irrelevant," it does emphasize that state child welfare agencies and courts are generally not "well-positioned to assess when cultural biases or lack of knowledge is, or is not, implicated."[44] A default rule requiring cultural expert testimony reduces the chance that cultural bias will affect ICWA decisions.

Our recent decision in *In re April S.* acknowledges this point.[45] There the child had extreme mental health needs, evidenced in part by repeated suicide attempts.[46] A mental health expert testified that the child needed intensive treatment that could only be obtained at a secure residential treatment center; the superior court authorized removal

---

[41]     BIA Commentary, *supra* note 19, at 38,830.

[42]     *Id.* at 38,829 (quoting *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 36 (1989)).

[43]     *Id.* at 38,830.

[44]     *Id.*

[45]     467 P.3d 1091, 1099 (Alaska 2020).

[46]     *Id.*

of the child for that treatment.[47]  We held that "[t]he superior court carefully, thoughtfully, and correctly determined that [cultural] knowledge . . . was unnecessary" because the child's removal was based on her need for intensive inpatient medical treatment, not "because of any specific living conditions at her mother's home that might implicate cultural biases."[48]

We thus emphasized that the exception to the default rule requiring cultural expert testimony is "very limited," but held that the particular facts of the case "f[ell] within that very limited exception."[49]  The concurring opinion in *In re April S.* also emphasized the limited scope of the exception, cautioning that deeming knowledge of tribal culture to be "plainly irrelevant" based on testimony of an expert without knowledge of tribal culture "may rest on hopelessly circular logic."[50]

Two examples help to illustrate the importance of limiting the exception to the cultural expert testimony requirement.  The first example is substance abuse.  The BIA emphasized "that children can thrive . . . even . . . when a parent is . . . a substance abuser."[51]  Alcohol abuse has historically been a concerning justification for breaking up Indian families.  Indeed, when ICWA was passed, Congress was concerned that alcohol abuse was frequently cited to remove Indian children but was rarely cited to remove non-Indian children — even when comparing areas with "[similar] rates of problem

---

[47]    *Id.* at 1094-96, 1099.

[48]    *Id.* at 1099.

[49]    *Id.*

[50]    *Id.* at 1100 (Winfree, J., concurring).

[51]    BIA 2016 Guidelines, *supra* note 21, at 53.

drinking."[52] Congress attributed this disproportionate rate of removal of Indian children, as summarized by the BIA, to "[n]on-Indian socioeconomic values that State agencies and judges applied [that did] not account for the difference in family structure and child-rearing practices in Indian communities . . . [l]ayered together with cultural bias."[53] Therefore, when a judge must consider whether continued custody by a parent with a substance abuse problem is likely to cause damage to the child, expert testimony about the prevailing social and cultural standards of the tribe helps to ensure the judge's decision rests on evidence relevant to the child's reality, rather than on unfounded assumptions or inapplicable cultural norms.

The second example relates to child-parent bonding and attachment. Attachment theory is grounded, according to the American Psychological Association, on the "need for the young to maintain close proximity to and form bonds with their caregivers."[54] In these cases Dr. Cranor's expert reports discussed how "[a]ttachment requires constant day-in, day-out mutually reinforcing and reciprocal interactions between the parental figure and the child." But that view of healthy attachment — that the child must have constant daily interactions with the parent — may not be shared by the child's tribe. Indeed, Congress noted it was an accepted practice within some tribes for Indian parents to leave their children in the care of extended family for periods of time, and terminating parental rights for that practice would be "ignorant of Indian

---

[52]    H.R. REP. NO. 95-1386, at 10 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 7530, 7532; BIA Commentary, *supra* note 19, at 38,781.

[53]    BIA Commentary, *supra* note 19, at 38,781.

[54]    AM. PSYCH. ASS'N, *Attachment Theory*, AMERICAN DICTIONARY OF PSYCHOLOGY 86 (Gary R. VandenBos ed., 2d ed. 2015).

cultural values and social norms."[55]  The BIA has also reiterated that "certain bonding and attachment theories[] presented by experts . . . are based on Western or Euro-American cultural norms and may have little application outside that context."[56]  Without any cultural expert testimony, a superior court might rely on evidence based on a particular attachment theory to remove the child, even though the theory may not be applicable within the child's tribe.  A rule requiring OCS to present cultural expert testimony in all but a very limited number of cases helps to effectuate the goals of ICWA by ensuring that ICWA determinations are informed by cultural context.

We recognize that our prior cases may be interpreted as allowing a broader exception.  In *Eva H.*, one of our first cases to apply the BIA Regulations, we noted that cultural expert testimony was not strictly required in every case; the BIA Regulations allowed exceptions to the cultural expert testimony requirement.[57]  We explained that our earlier decisions were therefore consistent with the BIA Regulations to the extent that they recognized the existence of an exception.[58]  This does not mean, however, that our prior case law is entirely consistent with the BIA Regulations on expert testimony.[59]  In those pre-regulation cases, we attempted to determine whether specific sets of facts

---

[55]     H.R. REP. NO. 95-1386, at 10, *as reprinted in* 1978 U.S.C.C.A.N. 7530, 7532; BIA Commentary, *supra* note 19, at 38,830.

[56]     BIA Commentary, *supra* note 19, at 38,830 (quoted in *In re April S.*, 467 P.3d 1091, 1098 (Alaska 2020)).

[57]     *Eva H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 436 P.3d 1050, 1053-54 (Alaska 2019).

[58]     *Id.* at 1054.

[59]     Our case law predating the BIA Regulations did seek to abide by the earlier Guidelines. *See, e.g.*, *L.G. v. State, Dep't of Health & Soc. Servs.*, 14 P.3d 946, 952 (Alaska 2000) (discussing the BIA 1979 Guidelines).

implicated cultural bias.[60] Nevertheless, our decisions could be read as carving out entire categories of conduct in which cultural bias is supposedly not implicated.[61] These categories — including abandonment, physical neglect, and substance abuse — encompass a significant portion of the conduct that brings families into the child welfare system. Such a broad exception is not consistent with the language of the BIA Regulations or the BIA's observation that state agencies and courts, largely staffed by individuals who are not tribal members, are generally in a poor position to determine whether cultural bias is at work. To the extent our prior cases can be interpreted as declaring entire grounds for termination immune to cultural bias, we disavow that

---

[60] *E.g.*, *Victor B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, No. S-16237, 2016 WL 6915519, at *6 (Alaska Nov. 23, 2016) ("We have declined to approach this question categorically, instead reviewing the facts of each case to determine whether cultural mores were implicated.").

[61] *See, e.g.*, *L.G.*, 14 P.3d at 952-54 ("When there is clear evidence of physical neglect, a trial judge may terminate parental rights without hearing testimony from an expert in Native culture."); *Thea G. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 291 P.3d 957, 964 (Alaska 2013) ("[I]n general, cases involving issues of parental substance abuse do not implicate cultural mores.").

interpretation.[62] Instead it is appropriate for judges to be hesitant to declare that cultural knowledge is "plainly irrelevant" in a given case.[63]

We also recognize that our prior cases may be interpreted to place the burden on parents to show that OCS's case for terminating their parental rights implicates cultural bias.[64] We disavow this interpretation as well.[65] OCS bears the

---

[62] We also reject OCS's suggestion at oral argument that cultural expert testimony is only (or principally) required in cases involving conduct or conditions that historically led to unwarranted removal of Indian children from their families, listed in 25 CFR § 23.121(d): "community or family poverty, isolation, single parenthood, custodian age, crowded or inadequate housing, substance abuse, or nonconforming social behavior." Although removal based on these conditions may be especially susceptible to cultural bias, this list is certainly not exclusive. The BIA specifically emphasized that it disagreed with the "suggestion that State courts or agencies are well-positioned to assess when cultural biases or lack of knowledge is, or is not, implicated. ICWA was enacted in recognition of the fact that the opposite is generally true." BIA Commentary, *supra* note 19, at 38,830. To the extent that there is any ambiguity about whether the list is exclusive, we reiterate that Supreme Court precedent directs that we "must resolve ambiguities in statutes affecting the rights of Native Americans in favor of Native Americans." *John v. Baker*, 982 P.2d 738, 752-53 (Alaska 1999) (citing *Bryan v. Itasca County*, 426 U.S. 373, 392 (1976)).

[63] BIA Commentary, *supra* note 19, at 38,830.

[64] *See In re April S.*, 467 P.3d 1091, 1100, 1100 n.3 (Winfree, J., concurring) (first quoting *Thea G.*, 291 P.3d at 964) ("The mother . . . points to nothing to suggest that cultural issues or cultural bias played a role in OCS's actions, in the expert witness's testimony, or in the superior court's decision to terminate her rights."); and then quoting *Payton S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 349 P.3d 162, 172 (Alaska 2015) ("But the mother's assertion that 'cultural mores and society were implicated in this termination trial' does not appear to have been raised in the trial court, and she presented no evidence to support it.") (internal alterations omitted throughout)).

[65] *See id.* at 1100 (cautioning against "plac[ing] the onus on Native families to prove cultural implication").

evidentiary burden to meet ICWA's requirements.[66] Therefore the burden is on OCS to show that culture is "plainly irrelevant" to the case such that it falls within the very limited exception to the need for cultural expert testimony.[67]

OCS argues that ICWA resolves the problem of cultural bias by requiring expert testimony on the causal relationship between the parent's conduct and serious damage to the child. But this argument fails to address the BIA Regulations themselves. The BIA Regulations resulted from the BIA's concern that expert testimony uninformed by cultural context may still result in unwarranted removal and termination. The BIA cautioned that because "States have failed to recognize the essential Tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families[,] . . . expert testimony presented to State courts should reflect and be informed by those cultural and social standards."[68] The BIA thus emphasized that "the question of whether the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child is one that should be examined in the context of the prevailing cultural and social standards of the Indian child's Tribe."[69]

Therefore the need for expert testimony about the prevailing social and cultural standards of the child's tribe is the rule, not the exception. The exception to this rule is "very limited."[70] And it is not the parents' burden to show that knowledge of tribal cultural context is relevant to deciding whether the children are likely to suffer

---

[66] *Diana P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 355 P.3d 541, 546 (Alaska 2015).

[67] BIA Commentary, *supra* note 19, at 38,830.

[68] *Id.* at 38,829; *see also* 25 U.S.C. § 1901(5).

[69] *Id.*

[70] *In Re April S.*, 467 P.3d at 1099 (majority opinion).

serious damage.[71] Instead it is OCS's burden to prove to the court, beyond a reasonable doubt, that "continued custody of the child . . . is likely to result in serious emotional or physical damage to the child."[72] We cannot fault a judge who, facing this high bar, is unwilling to confidently declare that knowledge of tribal standards is "plainly irrelevant" to assessing the particular facts of the case.[73] For these reasons, a superior court does not err if it rules that cultural expert testimony is needed to competently weigh the evidence in a given case.[74]

The evidence presented in these cases illustrates why this rule is justified. Both cases involved evidence of substance abuse, attachment theory, and financial reliance on others — all areas that the BIA has highlighted as prone to cultural bias.[75]

---

[71]   BIA Commentary, *supra* note 19, at 38,830.

[72]   25 U.S.C. § 1912(f); CINA Rule 18(c)(4).

[73]   Indeed, the concurring opinion in *In re April S.* urged judges to "demand more" of OCS when cultural considerations may be in play so that judges can rule out the possibility of findings based on inappropriate assumptions or inadequate knowledge. *In re April S.*, 467 P.3d at 1100 (Winfree, J., concurring).

[74]   To avoid the risk that trial takes place without the cultural expert testimony that the judge ultimately deems necessary, OCS may move in advance of trial for a ruling that knowledge of cultural standards is "plainly irrelevant" to the issue of serious damage. BIA Commentary, *supra* note 19, at 38,830; *see* Alaska R. Civ. P. 16(c)(16) ("At any [pretrial] conference under this rule consideration may be given, and the court may take appropriate action, with respect to . . . matters as may facilitate the just, speedy, and inexpensive disposition of the action."); Alaska R. Civ. P. 16(e) (discussing pretrial orders).

[75]   BIA Commentary, *supra* note 19, at 38,781 (discussing alcohol abuse as frequent justification for removal); *id.* at 38,830 (explaining that certain attachment theories "may have little application" outside a Western or Euro-American cultural context); *id.* at 38,829 (emphasizing that ICWA's purpose was to "make sure that Indian

(continued...)

Substance abuse was a justification that OCS relied upon in both its termination petitions. Attachment theory was prominent in Dr. Cranor's expert testimony in both cases. Dr. Cranor also highlighted the parents' economic situations, emphasizing that Linette and Cissy relied on family members and community agencies for financial support. The superior court did not err by requiring cultural expert testimony to provide context for evaluating this evidence about likelihood of serious damage to the children.

C.   **We Affirm The Superior Court's Ruling That The Cultural Expert Testimony Presented In These Cases Was Inadequate**.

Some expert testimony regarding tribal cultural standards was presented in each of these cases, but the superior court concluded this expert testimony was insufficient to support termination of parental rights. The superior court faulted the testimony for two main reasons. First, the court ruled that *Oliver N.* requires the cultural expert to be familiar with the facts and circumstances related to the particular family in the case and to testify specifically about the likelihood of serious damage to the child if returned to the parent. Second, the superior court ruled that the cultural expert testimony was not sufficiently "in depth about the specifics of the[] tribal values" and that although each of the proffered experts appeared to have ample knowledge of tribal customs, the vague and generalized testimony elicited by OCS did not "assist the trier of fact to understand the evidence."[76]

As explained further below, the superior court's interpretation of *Oliver N.* was mistaken. An expert on tribal cultural practices need not testify about the causal connection between the parent's conduct and serious damage to the child so long as there

---

[75]      (...continued)
child-welfare determinations are not based on 'a white, middle-class standard' " (quoting *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 36 (1989))).

[76]      Alaska R. Evid. 702(a).

is testimony by an additional expert qualified to testify about the causal connection.[77] But we conclude that the superior court did not clearly err by finding the testimony so vague, generalized, and unhelpful that it deserved no weight, and we affirm the superior court's rulings on that basis.

### 1. A cultural expert need not opine on the causal connection between the parent's conduct and the serious damage to the child.

To support removal of a child from the family or termination of parental rights in an ICWA case, OCS must always present an expert witness qualified to testify about the causal relationship between parental conduct and serious damage to the child.[78] In *Oliver N.* we concluded that the sole expert witness presented did not have the qualifications to testify about that causal relationship.[79]

But if one witness is qualified to testify and does testify about the causal relationship, then a separate expert qualified to testify about tribal culture need not also directly opine on causation.[80] It is permissible to satisfy ICWA's expert witness requirement by aggregating the testimony of expert witnesses.[81] In *Oliver N.* we specifically explained that "[a] tribal expert does not need to be qualified to speak to the

---

[77]     *Oliver N. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 444 P.3d 171, 178-79 (Alaska 2019).

[78]     25 C.F.R. § 23.122(a) (2022); *see also Eva H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 436 P.3d 1050, 1054 (Alaska 2019).

[79]     *Oliver N.*, 444 P.3d at 179-80.

[80]     BIA 2016 Guidelines, *supra* note 21, at 54.

[81]     *In re Candace A.*, 332 P.3d 578, 584 (Alaska 2014).

likelihood of harm to the child if there is a second qualified expert who can."[82]  The BIA 2016 Guidelines concur, noting that "[s]eparate expert witnesses may be used to testify regarding potential emotional or physical damage to the child and the prevailing social and cultural standards of the Tribe."[83]

In each termination trial OCS presented testimony from Dr. Cranor, who was qualified to testify about the relationship between the parents' conduct and serious damage to the children, and did testify on this topic.[84]  It was therefore not necessary for the experts in tribal social and cultural standards to testify regarding the causal relationship as well.  Rather, those cultural experts' testimony could focus on contextualizing the parents' conduct and answering some of the questions the court raised in its decisions.  For instance, the superior court sought more information on "what constitutes substance abuse within the [T]ribe," how the Tribe defines child abuse, "what violations specifically are deviations from [tribal] norms, values, or standards, such that intervention was required," and what interventions were available within the Tribe.  These are questions cultural experts are exceedingly well suited to answer.[85]

---

[82]    *Oliver N.*, 444 P.3d at 178-79.

[83]    BIA 2016 Guidelines, *supra* note 21, at 54.

[84]    25 C.F.R. § 23.122(a) (2022); *Oliver N.*, 444 P.3d at 179 (explaining that experts who are clearly qualified often have "substantial education" in psychology and "direct experience" with conducting psychological assessments (quoting *Eva H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 436 P.3d 1050, 1057 (Alaska 2019))).

[85]    BIA 2016 Guidelines, *supra* note 21, at 54-55 (outlining the expectations for testimony on tribal social and cultural standards).

**2.     It was not clear error to conclude that the cultural expert testimony elicited by OCS was too vague and generalized to support the termination of parental rights in these cases.**

The superior court found the cultural expert testimony elicited in these cases too vague, generalized, and unhelpful to assist the trier of fact. We largely agree with this assessment and see no clear error in the superior court's decision to place no weight on the sparse testimony provided.

In ICWA cases expert testimony about a tribe's beliefs, practices, and traditions allows the court to analyze evidence about parental conduct and serious damage to children within the cultural context of the tribe. This testimony will ideally address prevailing practices or norms that other witnesses and the court may be unaware of.[86] For example, if a parent's substance abuse causes the parent to leave the child with a series of caregivers in the tribe for long periods of time, and OCS's expert psychologist testifies that the child is in danger of psychological damage due to ruptured attachments, the cultural expert might testify about the important role of extended family and the tribal community in raising children, and whether or not the tribe views "constant, day-in and day-out, mutually reinforcing and reciprocal interactions between the parental figure and the child" to be a prerequisite for healthy development. The testimony may also highlight cultural practices that mitigate harm to children where a safety risk might otherwise be perceived. For instance, a cultural expert might testify about whether tribal

---

[86]     *Id.* at 54 ("Congress wanted to make sure that Indian child-welfare determinations are not based on 'a white, middle-class standard . . . .' Congress recognized that States have failed to recognize the essential Tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." (quoting *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 36 (1989))).

customs of sharing food and other necessities may prevent harm to a child whose parents are unable to obtain these necessities themselves due to addiction.

To provide meaningful assistance to the court, a cultural expert's testimony — as with other experts' testimony —  must somehow be grounded in the issues or questions presented in the case.[87] Such grounding can be facilitated in a variety of ways, including allowing the expert to review relevant records,[88] providing the expert with information, and asking detailed questions that provide the expert with important context.[89] Without context, one could not expect the cultural expert to understand what values or practices may be relevant to the situation.  Relatedly we observe that cultural experts possess and provide to courts information and perspective vital to upholding the purposes underlying ICWA.[90]  A party calling a cultural expert witness should further the expert's ability to impart this important information and context by providing the expert with the same reasonable opportunity to prepare for trial afforded to other experts.

---

[87]     *See* Alaska R. Evid. 702(a) (allowing expert testimony provided it "will assist the trier of fact to understand the evidence or to determine a fact in issue"); Alaska R. Evid. 703 (explaining that an expert may base opinion on "facts or data in the particular case . . . perceived by or made known to the expert at or before the hearing").

[88]     *E.g., Ben M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 204 P.3d 1013, 1020-21 (Alaska 2009) (explaining that expert witness had reviewed records and heard parent's testimony).

[89]     *J.A. v. State, Div. of Fam. & Youth Servs.*, 50 P.3d 395, 400-01 (Alaska 2002) (explaining that testimony was sufficiently grounded in facts when the expert responded to "several hypothetical questions" that included detailed information about family history, substance abuse and treatment attempts, failed aftercare attempts, exposure of the children to substance abuse and domestic violence, and sexual abuse).

[90]     *See* BIA 2016 Guidelines, *supra* note 21, at 5 (summarizing legislative history).

The cultural experts in the present cases were not afforded any meaningful opportunity to learn or review relevant facts about the families or safety risks at issue. Nor did OCS provide any specific or detailed information in its questioning of the experts. In stark contrast, OCS gave Dr. Cranor at least two months and hundreds of pages of records to prepare for her testimony in each case. In Linette's case, Ballot, the expert on the Native Village of Selawik, indicated while testifying that she would have liked more information about the situation. Charlie, who testified regarding the Nenana Native Village, had not reviewed any documentation prior to testifying, though she had some background knowledge from a former case involving the family "a long time ago." She indicated that access to more information "[p]robably would" have been helpful for her during preparation for trial.

In Cissy and Butch's case, cultural expert Kaleak admitted that she was not "very familiar with the facts" of the case and had only ten minutes to review the petition.[91] In direct examination, OCS only provided the background that "the general concern[s] . . . [we]re substance abuse, rampant domestic violence, and high risk for neglect." OCS's argument that Kaleak had the opportunity to review the termination petition, and that the petition provided sufficient information about the case, is both unpersuasive and troubling in its presumption that any additional information would not implicate or inform Kaleak's cultural expertise and insights.[92]

Without information regarding the facts of the case or detailed questioning, the experts were forced to discuss tribal practices in very general terms that were not helpful to the superior court. The questions OCS asked the experts in each case were

---

[91]     *Cf. J.A.*, 50 P.3d at 400-01.

[92]     *Cf. id.* (describing detailed hypothetical questions at trial concerning the situation).

extremely cursory and realistically could only be answered in one way. In each of the cases, OCS asked the cultural experts some variation of: Is "substance abuse, neglect, abandonment, domestic violence, and mental illness . . . within the cultural values of [the Tribe]?" In each of these cases, the cultural experts predictably indicated that those behaviors or difficulties are not within the cultural values of their Tribes.

During Linette's trial, OCS asked Ballot to explain the Native Village of Selawik's "prevailing cultural values with regard to child-raising," and Ballot testified that the Tribe's values include respecting elders, taking care of family, and subsistence lifestyles. OCS then asked Ballot whether she had "any concerns that the[] children have been removed from their parents' care because of any . . . violation of those cultural values." In response Ballot told OCS she would like some more information about the parents' efforts to regain custody, to which OCS said it could not "give [her] those answers." When questioning Charlie, OCS asked: "[I]s it a cultural value in the Native Village of Nenana to keep children safe?" Charlie indicated that it is, and that "[i]t also should be like that everywhere, really."

The testimony elicited during Cissy and Butch's trial was also quite superficial. OCS asked just two substantive questions: what the expert would identify as the cultural values of the Native Village of Barrow and whether substance abuse, domestic violence, and neglect were within the Tribe's cultural values. Only on cross-examination did the expert even reference possible interventions within the Tribe — again only superficially.

This kind of questioning and the responses it elicited do not help the trier of fact contextualize the parents' conduct and potential damage to the children within the

values and practices of the respective Tribes.[93]  As the Nenana Native Village suggests in its brief, keeping children safe is likely an important value in all cultures.  A statement that the Tribe values keeping children safe is not helpful to a trier of fact.  Similarly, it is not enough to simply ask whether a certain type of conduct (e.g., "substance abuse" or "domestic violence") is a "tribal value."  Substance abuse is not a "value" of any culture we are aware of, and yet even in non-ICWA cases we do not terminate parental rights just because parents abuse alcohol or use illegal drugs — what we are focused on is harm to the child.[94]  The superior court, in its orders denying OCS's motions for reconsideration, identified several lines of questioning that would have elicited helpful testimony, including how substance abuse is defined within the Tribes and what interventions would have been available to the families within the Tribes.

In both cases there is reason to believe cultural assumptions informed the evidence presented to some degree.  Had the cultural experts had a chance to review the record — particularly the other expert testimony — they may have been able to respond to and contextualize it.  For instance, Dr. Cranor emphasized attachment theory and the economic situation of the families in both cases — areas that may implicate cultural mores or biases.[95]  If the cultural experts were aware of this testimony, they could have

---

[93]    25 C.F.R. § 23.122(a) (2022).

[94]    CINA Rule 18(c)(1).

[95]    BIA Commentary, *supra* note 19, at 38,830 ("[C]ertain bonding and attachment theories, presented by experts in foster-care, termination-of-parental-rights, and adoption proceedings are based on Western or Euro-American cultural norms and may have little application outside that context."), *quoted in In re April S.*, 467 P.3d 1091, 1098 (Alaska 2020); BIA 2016 Guidelines, *supra* note 21, at 53 ("[C]hildren can thrive when they are kept with their parents, even in homes that may not be ideal . . . or when a parent is single, impoverished, or a substance abuser.").

addressed attachment theory, economic interdependence, and housing practices in the context of prevailing tribal standards.

Based on the extremely general nature of the cultural expert testimony, it was not clearly erroneous for the superior court to afford the testimony no weight.

## V.  CONCLUSION

We AFFIRM the superior court's denial of OCS's termination petitions and remand for further proceedings consistent with this opinion.