NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| CLARK J., | ) | |
| | ) | Supreme Court No. S-18879 |
| Appellant, | ) | |
| | ) | Superior Court Nos. 3GL-16-00002/ |
| v. | ) | 00003/00004 CN |
| | ) | |
| STATE OF ALASKA, DEPARTMENT | ) | MEMORANDUM OPINION |
| OF FAMILY AND COMMUNITY | ) | AND JUDGMENT* |
| SERVICES, OFFICE OF | ) | |
| CHILDREN'S SERVICES, | ) | No. 2038 – July 24, 2024 |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Glennallen, Rachel Ahrens, Judge.

Appearances: Olena Kalytiak Davis, Anchorage, for Appellant. Laura Fox, Senior Assistant Attorney General, Anchorage, and Treg Taylor, Attorney General, Juneau, for Appellee.

Before: Maassen, Chief Justice, and Carney, Henderson, and Pate, Justices. [Borghesan, Justice, not participating.]

# I.     INTRODUCTION

In 2021 we reversed the termination of a father's parental rights because the Office of Children's Services (OCS) failed to make active efforts to reunify him

---

\*      Entered under Alaska Appellate Rule 214.

with his Indian children.[1]  After his rights were reinstated, OCS tried to engage the father in case planning and visitation with the children but he largely avoided contact with OCS.

OCS again petitioned to terminate the father's parental rights in September 2022.  The superior court terminated his rights for the second time and the father appeals.  He argues OCS failed to make active efforts as required by the Indian Child Welfare Act (ICWA).  He also challenges the superior court's finding that he abandoned the children and argues the expert testimony did not adequately support finding the children would be at risk of serious harm if returned to his care.  We disagree and affirm the termination of his parental rights.

## II.    FACTS AND PROCEEDINGS

### A.    Background

Clark J.[2] is the father of Antoine (age 18), Oona (age 16), and Jenna (age 12). The children's mother, Melina B., died in April 2019.  The children are members of Melina's tribe, making them Indian children under ICWA.[3]  OCS took custody of the children in 2016 and Clark's parental rights were terminated four years later.[4]  We reversed the termination of Clark's parental rights in 2021 because we determined OCS had failed to make active efforts to reunify Clark with the children for the two years preceding trial.

---

[1]     The Indian Child Welfare Act (ICWA) defines "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe."  25 U.S.C. § 1903(4).

[2]     We use pseudonyms to protect the privacy of the family.

[3]     *See* 25 U.S.C. § 1903(4).

[4]     A more complete description of the circumstances surrounding the children's removal and the first termination trial can be found in our previous opinion, *Clark J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.* (*Clark J. I*), 483 P.3d 896 (Alaska 2021).

After Clark's parental rights were reinstated, OCS attempted to get in touch with Clark to make a case plan. OCS arranged weekly supervised phone calls between Clark, who was in Anchorage, and his daughters, who lived in Fairbanks, in the summer of 2021.[5] OCS suspended the phone calls in September because the conversations had become "heated" and the OCS worker supervising the calls was concerned they were not healthy for the children. The superior court held an evidentiary hearing in November and ordered OCS to resume the calls. However, neither Clark nor the children called in for any phone calls after the hearing. OCS continued to make the weekly phone line available from December 2021 through July 2022.

OCS caseworkers tried to get in touch with Clark regularly through phone calls, text messages, emails, mail, and home visits but were rarely successful. OCS scheduled two in-person visits between Clark and his daughters, one in Fairbanks and the other in Anchorage, but Clark did not show up for either visit.[6] Clark also missed five scheduled meetings with caseworkers before finally attending one in September 2022. He did not show up for any urinalysis (UA) appointments that OCS scheduled for him or pick up bus passes that OCS offered to him.

OCS filed a termination petition in September 2022, alleging that the children were in need of aid as a result of abandonment and neglect.[7]

B.    Termination Trial

A termination trial was held over the course of three days between May and June 2023. Two OCS caseworkers testified, as did the children's foster parents and two expert witnesses. Clark did not testify.

---

[5]    Antoine, who is now 18, was not involved in these calls because he preferred unsupervised contact with his father and had given Clark his phone number.

[6]    Clark did fly to Fairbanks for one of those attempted visits but did not attend because he became ill. He did not go to the OCS office when the girls flew to Anchorage for the second attempted visit.

[7]    *See* AS 47.10.011(1), (9).

The caseworkers testified about their difficulty reaching Clark, the services they made available to him, including UAs, bus passes, and cab rides, and their attempts to facilitate in-person visits and encourage Clark to send letters to the children.

Oona's and Jenna's foster parent testified that the girls had seen Clark in person only twice in the previous seven years and did not want to have phone calls with him. She testified that Clark sent Oona and Jenna gifts on two occasions.

Antoine's foster parent testified that Antoine had some in-person visits and phone contact with Clark. But she and Antoine travelled to Anchorage to meet with Clark on two of those four occasions because Clark had failed to go to the OCS office to sign the paperwork that was necessary for Antoine to obtain his learner's permit and driver's license. She also testified that although Clark had Antoine's phone number, they did not speak frequently.

OCS called Karen Morrison as an expert in child welfare. Morrison testified that all three children were likely to suffer serious emotional harm if they were returned to their father's care. She highlighted that the children had been out of Clark's care for nearly seven and a half years by the time of trial and opined that Clark had not taken the necessary steps to connect and bond with the children. She testified that the children did not have a relationship with their father and that removing Oona and Jenna from their foster home, where they felt safe and had been for many years, would cause "a lot of emotional distress and harm."

OCS also called Arlene Peter, a member of the children's tribe and a tribal court judge, who had been designated by the Tribe to testify about its cultural practices and child protection. She initially testified that she had not been able to review all of the documents that had been provided to her due to a flood. The parties agreed to postpone her testimony and she testified a month later. Peter testified that she had reviewed the file that had been provided to her and that although Clark had been invited to provide her with any additional information, he had not done so.

Peter testified that the Tribe viewed substance abuse and abandonment similarly to the way OCS did. She testified that the tribal court would terminate parental rights when a parent does not engage or comply with their case plan. She testified that Morrison's opinion was consistent with cultural practices and that she believed removing Oona and Jenna from their foster home would cause them harm because they had been there a long time, were bonded to their foster parent, felt safe, and the home was culturally appropriate. She also stated that the Tribe agreed that it was in the children's best interests for Clark's rights to be terminated.

Peter described the Tribe's approach to abandonment, noting that it considered no contact between a parent and child for six months to a year to be abandonment. She testified that Clark had abandoned the children because he had failed to visit them since his rights were reinstated two years earlier without any explanation. She also testified that she was not aware of any indication that Clark intended to re-engage or care for the children again, and under these circumstances tribal law would support terminating parental rights.

### C. Termination Order

In September 2023 the superior court terminated Clark's parental rights. The court found the children in need of aid due to abandonment. It found that there was clear and convincing evidence that Clark had not remedied the conduct and conditions that placed the children in substantial risk of harm. The court also found that OCS made active efforts by maintaining a phone line for weekly phone calls between Clark and the girls, setting up two in-person visits with the girls, creating a case plan, authorizing bus passes, setting up UA appointments, and attempting to stay in regular contact with Clark through various means. Finally, the court concluded that termination was in the children's best interests.

Clark appeals, challenging the active efforts determination and abandonment finding, and arguing the expert testimony did not adequately support finding the children were at risk of serious harm if returned to his care.

## III. STANDARD OF REVIEW

"Whether the state complied with the active efforts requirement of ICWA is a mixed question of law and fact."[8] "Whether substantial evidence supports the court's conclusion that . . . children would likely be seriously harmed if they were returned . . . is a mixed question of fact and law."[9] And whether expert testimony satisfies ICWA is a question of law.[10] "We review the trial court's factual findings for clear error and its legal determinations de novo."[11] "We will find clear error only when a review of the entire record leaves us 'with a definite and firm conviction that the superior court has made a mistake.' "[12]

## IV. DISCUSSION

### A. OCS Made Active Efforts.

Clark argues OCS failed to make active efforts after the case was remanded in April 2021. Specifically, he argues OCS failed to identify or offer any services or rehabilitative programs, adequately facilitate family contact, or update his case plan in a timely or sufficient manner.

Before parental rights may be terminated in an ICWA case, the trial court "must conclude that active efforts have been made to prevent the breakup of the Indian

---

[8] *Clark J. I*, 483 P.3d 896, 900-01 (Alaska 2021) (internal brackets and quotation marks omitted) (quoting *Jude M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 394 P.3d 543, 550 (Alaska 2017)).

[9] *State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs. v. Cissy A.*, 513 P.3d 999, 1008 (Alaska 2022) (alterations in original) (quoting *J.A. v. State, Div. of Fam. & Youth Servs., Off. of Child.'s Servs.*, 50 P.3d 395, 399 (Alaska 2002)).

[10] *Walker E. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 480 P.3d 598, 606 (Alaska 2021).

[11] *Clark J. I*, 483 P.3d at 901 (internal brackets omitted) (quoting *Jude M.*, 394 P.3d at 550).

[12] *Id.* (quoting *Jude M.*, 394 P.3d at 550).

family and that those efforts have been unsuccessful."[13] Active efforts are "affirmative, active, thorough, and timely efforts intended primarily to . . . reunite . . . Indian child[ren] with [their] family."[14] "OCS's efforts must be reviewed as a whole, and a failure in one area or for a discrete amount of time will not necessarily bar a [determination] that OCS satisfied the active efforts standard over the life of the case."[15] "A parent's lack of cooperation or unwillingness to participate in treatment does not excuse OCS from making active efforts," but "a parent's actions have a place in the court's determination of whether OCS's efforts satisfy the ICWA standard."[16] We have explained that "a parent's noncooperation with OCS will necessarily affect the kinds of efforts OCS is able to make toward reunification";[17] thus, "[f]ailed attempts to contact the parent or obtain information from [the parent] may qualify as active efforts if the parent's evasive or combative conduct 'rendered provision of services practically impossible.' "[18]

OCS made significant efforts to contact and stay in touch with Clark. The primary caseworker testified that she attempted to reach Clark via phone call, text message, and email, and the secondary caseworker testified that she attempted to reach him on a monthly and sometimes weekly basis via phone call, text message, email, and

---

[13] 25 C.F.R. § 23.120(a).

[14] 25 C.F.R. § 23.2.

[15] *Mona J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 511 P.3d 553, 563 (Alaska 2022).

[16] *Id.* at 562 (first citing *Bill S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 436 P.3d 976, 983 (Alaska 2019); and then citing BUREAU OF INDIAN AFFS., U.S. DEP'T OF THE INTERIOR, GUIDELINES FOR IMPLEMENTING THE INDIAN CHILD WELFARE ACT 43 (Dec. 2016) (hereinafter BIA GUIDELINES)).

[17] *Id.* at 564.

[18] *Sylvia L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 343 P.3d 425, 433 (Alaska 2015) (quoting *E.A. v. State, Div. of Fam. & Youth Servs.*, 46 P.3d 986, 990 (Alaska 2002)).

visits to his known addresses. After learning Clark might have been living with his stepfather, she went to Clark's stepfather's home and left the permanency report and her business card, and asked that he tell Clark she was trying to reach him. The only time Clark called this caseworker back, she testified that he seemed surprised when she picked up the phone. Clark failed to show up to five of the six meetings that OCS managed to schedule with him after remand. Given OCS's difficulty reaching Clark and the fact that he missed five scheduled meetings before finally attending one in September 2022, any delay in completing a case plan does not detract from OCS's active efforts.

Although caseworkers had difficulty reaching Clark, there was testimony that once the caseworkers met with him in September 2022, they arranged for UAs, scheduling a UA appointment for the following day and setting up recurring random weekly UAs. But despite agreeing to the UAs, and agreeing to go to the appointment the next day, Clark never showed up. There was also testimony that the caseworkers offered Clark bus passes and cab rides.

OCS also facilitated phone calls between Clark, Oona, and Jenna in the summer of 2021, and maintained the conference line for weekly phone calls from December 2021 until July 2022. Clark argues that reestablishing the phone calls in December was not effective because his daughters had been told they did not have to call in. But Clark could have continued to call in to demonstrate to OCS and the court that he was committed to maintaining contact, and the primary caseworker testified that if he had done so OCS would have done more to encourage Oona and Jenna to participate. Clark was also able to communicate with Antoine freely but had rarely initiated contact and could have mailed the children letters but did not.

Clark argues OCS failed to employ "family preservation strategies" despite his requests for family therapy and in-person visits. The primary caseworker testified that family therapy was not set up because individual therapy would need to be started first with the children and then with Clark, whom she generally could not

reach. Family therapy may have been beneficial and OCS could have at least referred Clark to individual therapy. But given the fact that Clark was not answering caseworkers' phone calls and did not show up for an in-person meeting until almost a year later, OCS's decision not to arrange family therapy also does not detract from the active efforts it made.

OCS planned in-person visits for Oona and Jenna with Clark, which involved booking flights and hotel rooms since Clark was in Anchorage and the children were in Fairbanks. But Clark never showed up to those visits, even after he flew to Fairbanks, and after Oona, Jenna, and their foster parent flew to Anchorage. OCS made a third attempt to schedule an in-person visit for October 2022 but Clark did not respond to the caseworker's calls while she tried to set up the visit. And OCS did not facilitate visits between Clark and Antoine because Antoine was almost 18 and had given Clark his phone number.

On remand OCS made numerous attempts to contact Clark and case plan with him. He did not answer calls, respond to texts or emails, or attend meetings once they were scheduled. He also did not call in for phone calls with Oona and Jenna once they were reestablished, show up to in-person visits that OCS planned, send the children letters as OCS encouraged, attend UA appointments, or take advantage of transportation options that were offered to him. OCS made significant efforts to get Clark to engage but he opted not to do so. "A parent's actions have a place in the court's determination of whether OCS's efforts satisfy the ICWA standard,"[19] and "[f]ailed attempts to contact the parent or obtain information from [the parent] may qualify as active efforts if the parent's evasive or combative conduct 'rendered provision of services practically impossible.' "[20] Clark "rendered provision of services practically impossible"; OCS's

---

[19] *Mona J.*, 511 P.3d at 562 (citing BIA GUIDELINES, *supra* note 16, at 43).

[20] *Sylvia L.*, 343 P.3d at 433 (quoting *E.A.*, 46 P.3d at 990).

unsuccessful efforts to reunify Clark with his children satisfy ICWA's active efforts requirement.

**B. The Superior Court Did Not Clearly Err By Finding Clark Abandoned The Children.**

Clark argues that there was not sufficient evidence to find he abandoned the children, and that any failure to adequately support or communicate with the children was not "with willful disregard" but due to "OCS's lack of efforts blocking any progress toward communication and eventual support."

A court may find abandonment if a parent "has shown a conscious disregard of parental responsibilities toward the child by failing to provide reasonable support, maintain regular contact, or provide normal supervision, considering the child's age and need for care by an adult."[21] Abandonment may also be found when, without justifiable cause, a parent "left the child with another person without provision for the child's support and without meaningful communication with the child for a period of three months,"[22] "made only minimal efforts to support and communicate with the child,"[23] "failed to participate in a suitable plan or program designed to reunite the parent or guardian with the child,"[24] "failed to respond to notice of child protective proceedings,"[25] or "was unwilling to provide care, support, or supervision for the child."[26]

The superior court did not specify on which theory of abandonment its finding was based, but it stated that Clark "made no effort to provide support or engage

---

[21]    AS 47.10.013(a).

[22]    AS 47.10.013(a)(1).

[23]    AS 47.10.013(a)(2).

[24]    AS 47.10.013(a)(4).

[25]    AS 47.10.013(a)(7).

[26]    AS 47.10.013(a)(8).

in meaningful communication for approximately two years prior to the first trial" and that "[h]is extended absence led to an almost complete lack of any parent-child relationship." The court noted that Clark did not call in for any scheduled phone calls once they were reestablished in December 2021 and that the earlier phone calls were unpleasant for Oona and Jenna. The court noted that Clark texted Antoine only a few times, did not show up for in-person visits, never saw Oona or Jenna in person after his rights were reinstated, saw Antoine only twice,[27] and gave the children gifts on only two occasions.

The court concluded that Clark's behavior led to a complete breakdown of his relationships with the children. It highlighted that all of the children wanted his rights terminated, Oona agreed to attend in-person visits only because she believed he would relinquish his parental rights, Oona and Jenna wanted to be adopted by their foster parent, and Antoine perceived a lack of love and support from and towards his father. These findings are well-supported by the record.

Even though Clark wished to see the children and requested in-person visitation and family therapy, he did not cooperate with OCS to bring those requests to fruition. Even if Oona and Jenna were not calling in to their phone calls, Clark could have done so to demonstrate his desire for contact, and he could have attended the in-person visits that were planned and stayed in touch with the caseworkers so that other visits could be set up, but he did not. He also could have made more of an effort to stay in touch with Antoine, or sent letters to the children. The record supports the court's finding that Clark abandoned his children.[28]

---

[27] Antoine's foster parent's testimony suggests that Antoine saw Clark four times after his rights were reinstated. Because there was sufficient additional evidence to support the court's abandonment finding, this misstatement was harmless error.

[28] The superior court also noted that Clark failed to provide financial support to the children. In the absence of any evidence that Clark failed to provide required

## C.    The Expert Testimony Satisfied ICWA's Requirements.

Clark challenges the adequacy of expert testimony to support the court's finding that returning the children to his care would result in serious emotional or physical damage. Clark points out that the court did not mention Arlene Peter's testimony when discussing its serious harm finding and relied instead only on Karen Morrison's testimony. He also challenges Peter's familiarity with the facts of the case and ICWA's requirements.

ICWA requires that a court find by evidence beyond a reasonable doubt, including the testimony of qualified expert witnesses, that the continued custody of the child by the parent is likely to result in serious emotional or physical damage to the child.[29] This question "is one that should be examined in the context of the prevailing cultural and social standards of the Indian child's Tribe,"[30] so it is usually necessary to present testimony of a cultural expert.[31] Serious harm "may be proved through the testimony of one or more expert witnesses, or by aggregating the testimony of lay and expert witnesses."[32] "An expert on tribal cultural practices need not testify about the causal connection between the parent's conduct and serious damage to the child so long

---

child support, this was legal error. It is OCS's responsibility, not the parent's, to financially provide for children while they are in its custody. *See* AS 47.10.084(a), (c) (imposing duty on OCS to provide child with food, shelter, education, and medical care but noting parents retain "responsibility for support"); *Duke S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 433 P.3d 1127, 1134 (Alaska 2018) (same).

[29]    25 U.S.C. § 1912(f).

[30]    Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38,829 (June 14, 2016) (to be codified at 25 C.F.R. pt. 23).

[31]    There are limited exceptions to this rule. *See State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs. v. Cissy A.*, 513 P.3d 999, 1014-15 (Alaska 2022).

[32]    *Demetria H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 433 P.3d 1064, 1074 (Alaska 2018) (quoting *Bob S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 400 P.3d 99, 108 (Alaska 2017)).

as there is testimony by an additional expert qualified to testify about the causal connection."[33] "ICWA does not require that the experts' testimony provide the sole basis for the court's conclusion; ICWA simply requires that the testimony support that conclusion."[34]

Clark does not challenge Morrison's qualifications or testimony beyond arguing that it is insufficient on its own to satisfy ICWA because she lacks cultural expertise. But OCS also presented testimony from Arlene Peter, a member of the children's Tribe and tribal court judge, who was chosen by the Tribe to provide its cultural perspective. Clark's challenge to Peter's qualifications and the value of her testimony is not supported by the record. Although Peter was not initially prepared to testify — due to a flood that prevented her from reviewing the entire case file — she ultimately testified a month after having had a lengthy opportunity to review the records provided to her.

Clark's challenge to Peter's "lack of fluency" with ICWA is also misplaced. Peter testified as a cultural expert who provided cultural context for Morrison's opinion about harm to the children. In *Oliver N. v. State, Department of Health & Social Services, Office of Children's Services*, we determined that a tribal elder was "clearly qualified to testify to tribal cultural standards and childrearing norms," but his testimony was not sufficient on its own to support finding the child would suffer serious physical or emotional harm if returned to his father's care because the record did not show the tribal elder was "qualified to testify about the causal relationship."[35] But we explained that the testimony of tribal experts "about whether parental behavior conforms to tribal customs and values is welcomed and extremely

---

[33]   *Cissy A.*, 513 P.3d at 1015-16.

[34]   *Demetria H.*, 433 P.3d at 1074 (quoting *Bob S.*, 400 P.3d at 108).

[35]   444 P.3d 171, 179 (Alaska 2019).

beneficial when there is an additional expert qualified to testify regarding the likelihood of harm."[36]  Morrison was the additional qualified expert here.

In *Cissy A.*, we explained that a cultural expert's testimony "will ideally address prevailing practices or norms," and "must somehow be grounded in the issues or questions presented in the case," which can be facilitated by "allowing the expert to review relevant records" and "asking detailed questions that provide the expert with important context."[37]  OCS provided Peter with case records from 2021 to 2023 and asked questions grounded in the facts of the case.  These were not "superficial" questions with predictable answers like the ones we disapproved in *Cissy A*.[38]  Peter also had additional familiarity with the family from their involvement with the tribal court and Clark did not provide her any additional records, even though he had been given the opportunity to do so.

Peter did not "simply agree[] with Morrison," as Clark claims.  She testified that the Tribe's understanding of substance abuse and abandonment did not differ from OCS's and explained what might constitute abandonment in the tribal setting and the steps the tribal court might take if faced with a similar case.  She also testified that the Tribe would consider an older child's preference when determining whether termination would be proper.  Ultimately, Peter testified that the Tribe was in agreement that the children would be harmed if returned to Clark's care and supported termination.

Finally, although the superior court did not discuss Peter's testimony with specific reference to whether the children were likely to suffer serious emotional or physical harm if returned to Clark, it did cite Peter's testimony elsewhere in its findings that would support this conclusion.  As OCS argues, ICWA compliance does not turn

---

[36]  *Id.* at 180.

[37]  *Cissy A.*, 513 P.3d at 1017.

[38]  *See id.* at 1018.

on the heading under which the court organized its findings. The court discussed Peter's qualifications as a cultural expert. It referred to her testimony that the Tribe's position "is that [Clark] was given a second chance, yet after a few short months, never maintained regular contacts with the children with no explanation, and never followed through with anything OCS asked of him." It also cited Peter's testimony that "the girls will continue to learn their culture with the familial placement, and removal from that placement would cause harm." Because there was no challenge to the adequacy of Morrison's expert opinion that the children would suffer serious harm and there was significant testimony from Peter about the Tribe's cultural practices and agreement with Morrison's opinion, the expert testimony supports the court's finding.

## V.     CONCLUSION

We AFFIRM the superior court's termination of Clark's parental rights.